ANNIE F. A. HILTON, Appellant, v. ROSA P. ROYLANCE, Respondent.

No. 1368.    (69 Pac. 660.)

1.    Marriage: Nature of Contract: Dissolution.
A marriage contract creates a civil status, and is not subject, like other contracts, to dissolution by mutual consent of the parties, or in any other way except through the sovereign power of the State.

2.    Marriage: Consent: How Indicated.
The consent constituting the basis of a marriage contract does not depend upon any particular form of words, and may be indicated either in writing or verbally, or may be implied from the acts of the parties or from the ceremony performed.

25 Utah—9

**3.   Marriage: Validity: Ceremony not Essential.**
   In the absence of statutory requirement, a ceremony is not essential
      to the validity of a marriage.

**4.   Same; Cohabitation not Essential.**
   Cohabitation is not essential to the creation of the marriage status.

**5.   Same: Secret Reservation: No Effect.**
   Where a marriage has been celebrated by a properly authorized cere-
      mony, apparently with the consent of both parties, no secret in-
      tention or reservation of one of the parties at the time of such
      ceremony, unknown to the other party, can affect the validity
      of the marriage.

**6.   Marriage: "Sealing:" Meaning of Term: Mormon History
      and Records: Evidence Admissible.**
   Under Revised Statutes, section 3400, providing that historical
      works, books of science, etc., when made by persons indifferent
      between the parties, are prima facie evidence of facts of general
      notoriety and interest, historical works relating to the Mormon
      Church, and the records and journals of such church, are admis-
      sible to show the meaning of the term "sealing ordinance," as
      applied by the adherents of the Mormon faith to the ceremony
      of marriage.

**7.   Doctrines of Mormon Church: Judicial Notice.**
   Judicial notice will be taken of the creeds and general doctrine of
      the Mormon Church, and of the principles of celestial marriage
      peculiar to such church, as being matters of general history,
      which may be presumed to be subjects of common knowledge.

**8.   "Sealing Ordinance:"   Interpretation:   Marriage   for
      Time and Eternity.**
   The sealing ordinance of the Mormon Church, founded on the "Reve-
      lation on the Eternity of the Marriage Covenant," contained in
      the Book of Doctrines and Covenants of the Mormon Church,
      section 132, as indicated by the doctrine in relation thereto
      contained in such book, and as interpreted and practiced by the
      Mormon people, so far as the history, records, and journals of
      such church show, is a marriage ceremony contemplating mar-
      riage for time and eternity, and not for either time or eternity
      alone.

**9.   Sealing Ceremony: Common-Law Marriage: Surplusage.**
   The sealing ceremony of the Mormon Church, whereby the contract-
      ing parties agree and are declared by a duly authorized church
      official to be married for "time and eternity," creates a valid
      common-law marriage between parties believing and in good

faith participating therein; the part of such ceremony refering to eternity being mere surplusage.

**10. Same.**

Evidence relating to a ceremony of sealing performed between a man and woman, members of the Mormon Church, considered and *held* to show such belief and good faith on the part of the contracting parties as would make such ceremony a valid common-law marriage.

**11. Church Divorce: Invalid.**

The "church divorce" of the Mormon Church, whereby parties who have been sealed as husband and wife under the Mormon sealing ordinance agree, under the authority and with the consent of the church to dissolve their marital relations, is not a valid divorce, though the parties believe it to be valid, and thereafter go through a marriage ceremony with other parties.[1]

**12. Same: Remarriage: Estoppel.**

Where a woman who was married under the sealing ceremony of the Mormon Church obtained a "church divorce," and, believing such divorce to be valid, went through a marriage ceremony with another man, and lived with him as his wife, she was not thereby estopped, on learning that her divorce was invalid, from asserting her first marriage, and denying the legality of the second.

(Decided July 21, 1902.)

Appeal from the Third District Court, Salt Lake County.— *Hon. W. C. Hall,* Judge.

Action by the plaintiff, as the surviving wife and widow of John R. Park, deceased, claiming as such widow to be entitled to one-third of certain real estate which the deceased in his lifetime sold to the defendant, to have the same partitioned and set apart to her as her separate property in fee simple. From a decree in favor of the defendant, the plaintiff appealed.

REVERSED.

[1] Norton v. Tufts, 19 Utah 470, 57 Pac. 407.

*N. V. Jones, Esq.,* and *Messrs. Powers, Straup & Lippman* for appellant.

*Messrs. Bennett, Sutherland, Van Cott & Allison, Messrs. Pierce, Critchlow & Barrette,* and *Messrs. Stewart & Stewart* for respondent.

STATEMENT OF FACTS.

The plaintiff brought this action as the surviving wife and widow of John R. Park, deceased, and claims that she, as such widow, is entitled to one-third of certain real estate which the deceased in his lifetime sold to the defendant, and to have the same partitioned and set apart to her as her separate property in fee simple.   It is alleged in the complaint, among other things, that the plaintiff and John R. Park, now deceased, intermarried at Salt Lake City, Utah territory, on or about the first day of December, 1872, and were thereafter husband and wife, until the death of the decedent, which occurred at Salt Lake City about September 30, 1900; that the plaintiff is still the surviving wife and widow of the decedent, and is a resident of Utah; that the decedent in his lifetime was the owner of certain real estate described in the complaint, which he conveyed by deed to the defendant about August 7, 1900; that the plaintiff never in any manner conveyed or relinquished her rights in the said real estate, or any part thereof, and is now the owner of one-third in value of the property; and that the defendant entered into possession of the property under the deed, and has refused, and still refuses, upon demand made, to relinquish possession to plaintiff of her interest therein.   The prayer is that the plaintiff be adjudged to be the surviving wife and widow of the deceased, and that one-third of the real estate be set apart to her as her separate property.   The defendant, in her answer, admits the ownership and sale of the property by the decedent in his lifetime,

Hilton v. Roylance.

and her refusal to relinquish possession of any part thereof. She denies that the parties were married, and, further answering, alleges, *inter alia,* that about December 5, 1872, John R. Park and the plaintiff were "sealed," or went through a "sealing ceremony," whereby they agreed to be husband and wife after death; that the "sealing ceremony" was performed when the plaintiff was on her supposed deathbed, and after John R. Park had been assured that she would die; that both parties were members of the Mormon Church; that it was a tenet of that church that a man and a woman might be sealed, so that they would be husband and wife after death (that is, in eternity), and that both parties believed in that tenet; that the sealing ceremony was performed, not as a marriage contract, but in pursuance of said tenet only; that thereafter, upon the plaintiff unexpectedly recovering, the parties lived separate and apart, and agreed to "dissolve all such relationship between them as husband and wife"; that John R. Park remained an unmarried man; that the plaintiff about 1873 married William Hilton, and they ever since have lived together as husband and wife, and have had born to them ten children; and that after said agreement the plaintiff did not claim to be the legal wife of John R. Park until after his death.

It appears from the evidence that in 1872 the plaintiff, then Annie F. Armitage, nineteen years of age, met and was introduced to Dr. John R. Park, then an unmarried man of about forty years of age, a popular educator and resident of the territory of Utah. Dr. Park was a member of the Mormon Church, and Miss Armitage had also been converted to that faith. The meeting occurred on the steamship Minnesota, at Liverpool, England, and on their voyage to America the parties continued their acquaintance, and traveled together to New York. Dr. Park was kind and attentive to the lady on the voyage, and on their arrival at New York continued to pay her attention. After remaining in New York several

days, Miss Armitage continued her journey to Utah, and Dr. Park followed later, about October.    After his arrival in Utah the doctor called frequently on the plaintiff, and their relations became intimate.    About the middle of November, while staying at the house of Emeline Free Young, the plaintiff was taken ill, and continued to grow worse until she was not expected to live, when Mrs. Young, according to plaintiff's testimony, advised her that it would be better, in the event of her death, to be married than single, and said to her that she felt sure that Dr. Park intended to make her his wife, and advised her to accept him.    To this she finally consented, and Dr. Park was sent for, and on December 5, 1872, while thus on her sick bed, and not expected to live, she and Dr. John R. Park were, by mutual consent, sealed by Daniel H. Wells, a member of the "first presidency" of the Church of Jesus Christ of Latter-Day Saints, in the presence of a number of witnesses, most of whom are now dead.    Concerning the ceremony, the plaintiff testified that Dr. Park and Mr. Wells, who officiated, both came to the bedside, and that Mr. Wells then said, "Take her right hand in yours doctor; take Annie's right hand in yours doctor;" that Mr. Wells then said, "John R. Park, are you willing to take Annie F. Armitage as your lawful wedded wife?" to which the doctor said, "Yes;" that Mr. Wells then asked her a similar question (if she would take John R. Park to be her lawful husband), which she answered, "Yes;" and that Mr. Wells then, after saying something which she did not quite remember, said: "I now pronounce you husband and wife for time and all eternity." President Wells then issued a certificate of "sealing" to the parties, as follows: "John Rocky Park, born Tiffin, Seneca county, Ohio, 7 May, 1833. Annie Flora Armitage, born Nottinghill, London, 19 February, 1853.    The above parties were sealed by Prest. D. H. Wells in the presence of Emeline Free Young, at her residence in Salt Lake City, U. T., December 5, 1872.    The lady being on her supposed deathbed.    Daniel

H. Wells. S. L. City, U. T., December 5, 1872." Indorsed across the face of it: "Recorded in historian's office, journal of date, R. L. C." In answer to the question: "Now will you state the relative position that they occupied, one to the other, when the ceremony was performed?" the witness Mrs. Hannah C. Wells said: "Well, I couldn't tell you that. I couldn't tell you that. I only remember that there was a ceremony, and that they were married, but just their position I can't remember." Dr. Park did not consent to have the ceremony performed until the attending physician advised him that the patient had but a short time to live. This information was given the doctor outside the hearing of the plaintiff. Right after the ceremony, it appears, the parties were left alone together. The plaintiff, testifying, said she thought the doctor remained with her about an hour, and that she understood the marriage to take effect at once. Dr. Park continued thereafter to make frequent visits to her, while she was recovering from sickness, until about the month of February, when he ceased to visit her. She thereupon, on two different occasions, having met him in the street, insisted upon a divorce. The doctor agreed to arrange it for her, and about the nineteenth of March, 1873, appeared at the house where plaintiff was staying, when they mutually agreed upon and signed a document known as a "church divorce," which reads as follows: "Know all persons by these presents that we, the undersigned, John R. Park and Annie, his wife, before her marriage to him Annie Armitage, do hereby mutually covenant, promise, and agree to dissolve all the relations which have hitherto existed between us as husband and wife, and to keep ourselves separate and apart from each other, from this time forth. In witness whereof, we have hereunto set out hands at Salt Lake City, U. T., this nineteenth day of March, A. D. 1873. John R. Park. Annie Flora Park. Signed in the presence of D. McKenzie, James Jack." In October, 1875, a marriage ceremony between plaintiff and

William Hilton was performed in accordance with the rites of the Mormon Church, which marriage was admitted to be valid, if the plaintiff was then capable of contracting that relation.    Thereafter she lived with William Hilton as his wife, and a number of children have been born to them. The ceremony was also performed by Daniel H. Wells.    The plaintiff thought her church divorce was valid until she noticed the decision of this court in the case of Norton v. Tufts. Dr. Park never married again.    In his lifetime he owned the property in dispute, and conveyed it by deed to the defendant, but the plaintiff relinquished no rights therein which she may have acquired because of the marriage.    At the trial the court decided that John R. Park and the plaintiff never became or were husband and wife, and that the plaintiff is neither the owner of, nor entitled to any part of, the premises in controversy.    Thereupon this appeal was taken.

BARTCH, J., having stated the facts as above, delivered the opinion of the court.

The principal question to be determined is, were John R. Park and Annie F. Armitage lawfully married on December 5, 1872 ?    The appellant insists that the ceremony was performed according to the rites of the Mormon Church, by a person authorized to perform it, that it was a legal marriage, and valid at common law; and that the court erred in finding that the parties never intermarried and were never husband and wife.    The respondent contends that there never was a marriage in this case, because, as is insisted, there never was any consent to a marriage contract, and that the burden was upon the plaintiff to prove a marriage contract, which it is claimed she failed to do.    It is insisted by the respondent that the "sealing ceremony" which was performed and is relied upon as constituting a marriage ceremony simply made the parties thereto husband and wife for eternity (that is, after death, but not for time or this world, nor for time and

eternity), and that Dr. Park consented to be sealed to the plaintiff for eternity only. So far as appears from the record the sealing ceremony performed in this instance was, in substance, such as it was the custom to perform where members of the Mormon Church entered into matrimony. It is a ceremony peculiar to that church and its people, who constitute a large majority of the inhabitants of this commonwealth, and the importance of the main question herein presented, as affecting the marriage status and property rights in this State, must not be overlooked; for if, under the facts and circumstances disclosed in this record, there was no marriage, then it would seem impossible to conjecture how many of such sealing ceremonies, although performed by ordinance of the church, were, after all, mere nullities, creating no valid marital relations.

Marriage, strictly speaking, is not a mere civil contract, but a status created by contract. 1 Bish. Mar. & Div., sec. 34. It is true, it is founded in consent of the parties, but the consent is the contract because of which the status is created. Marriage differs from ordinary contracts, in that it can only exist where one man and one woman are legally united for life, whereas ordinary civil contracts may exist between two or more of either or both sexes for any stipulated time. So the marriage relation differs from other contractual relations in that, when the status is once created, the State becomes an interested party, and thereafter the marriage, with the rights and duties assigned by the law of matrimony, is not subject, as to its continuance, dissolution, or effects, to the mere intention and pleasure of the contracting parties. The marriage, with its privileges, obligations, rights, and duties which are or may be assigned by the law of matrimony for the establishment of families and the multiplication and education of human kind, continues during the life of the parties, and no dissolution of the status can be effected simply by the mutual consent or agreement of the

parties.    It is regulated and controlled, and can be dissolved only through the sovereign power of the State, whenever justice to either or both parties or the welfare of the public demands it.    1 Bish. Mar. & Div., secs. 11, 30.    The doctrine of ethics and of social science is universally recognized as the foundation of the marriage law, and from time immemorial marriage has been, in every civilized country, recognized as the foundation of civilization and of the social system. Neither one of the parties to the marriage can thereafter commit a breach of any of the obligations or duties assumed without a violation of conscience as well as of law.    In view of these things, how can it be said, as insisted for the respondent, that the "marriage contract is on a level with other contracts ?"    It is apparent that many of the rules of law applicable to the marriage status differ widely in material respects from those applicable to mere civil contracts.    Id., secs. 35, 36.    That, under the law, consent is the essence of marriage, the same as of every other contract, is true, and it is also true that the law does not compel parties to assume the matrimonial state without their mutual consent; but such consent, which, as we have seen, constitutes the contract to marry, may be given in writing or verbally, or may be inferred from the acts of the parties or the ceremony performed.    With reference to consent, in case of marriage, no particular form of words is necessary.    If, in language mutually understood, or by acts declaratory of intention, the parties accept each other as husband and wife, the marriage is consummated.    Nor, in the absence of a statutory requirement, is a ceremony indispensable to its validity.    Bissell v. Bissell, 55 Barb. 325.    At common law, where the parties cohabit together for a considerable length of time, and hold each other out as husband and wife, a marriage may be implied, though no ceremony was ever performed.    Mr. Bishop, in his work on Marriage, Divorce, and Separation, in volume 1, section 77, says:    "Because of the high favor

in which marriage is held by the law, we have transmitted to us the special maxim, *'Semper praesumitur pro matrimonio'* ('always presume marriage'). When a man and woman are living together as husband and wife, the law will hold them to be such, even against strong probabilities that they are not, or, when a ceremony of marriage is shown, there will be the like presumption that it is valid, unless some distinct and special fact clearly appears in the particular case to the contrary." So, where a marriage ceremony is performed according to the forms of a church or of a religious sect, consent of the parties and capacity to contract will be presumed.

Nor is cohabitation necessary to constitute a valid marriage. *"Consensus, non concubitus, facit matrimonium,"* is a maxim of the common law, of the civil law, and equally of the ecclesiastical law. In Fleming v. People, 27 N. Y. 329, Mr. Chief Justice DENIO said: "Prima facie the fact of a marriage celebrated according to the forms of a religious denomination embraces the requisite assent of the married parties to take each other as husband and wife; and if the party whose interest it is to dispute the marriage is satisfied with a general statement of the ceremony, and will not inquire more particularly as to what took place, he can not be permitted to deny the apparent effect of the evidence." 1 Bl. Comm., 433-435; 2 Kent, Comm., 87-89; Abb. Tr. Ev., 102-103; Bradner, Ev., 397; 1 Bish. Mar. & Div., sec. 383; 19 Am. and Eng. Ency. Law (2 Ed.), 1180-1182; People v. Calder, 30 Mich. 85; Dickerson v. Brown, 49 Miss. 357; Wilkie v. Collins, 48 Miss. 496; Caujolle v. Ferrie, 26 Barb. 177; Jackson v. Winne, 7 Wend. 47, 22 Am. Dec. 563; Hulett v. Carey, 66 Minn. 327, 69 N. W. 31, 34 L. R. A. 384, 61 Am. St. Rep. 419. While, however, present intention and mutual consent of the parties is necessary to constitute a valid marriage, still, where the marriage has been celebrated by a properly authorized ceremony, apparently with the assent of both parties, no secret reservation of

one of the parties, entertained at the time of the cere-
mony, unknown to the other party, can serve the party enter-
taining it to avoid· the marriage, for this would be a fraud
upon the innocent party, and the guilty one would· be estopped
to deny the marriage, or to take advantage of his or her own
wrong.    "One who causes the other to participate in what
marriage alone justifies, under the pretense, not incautiously
believed, that he means marriage, is in fundamental justice
estopped to set up his fraudulent intent in place of the one
he held out to the other, who has acted thereon by doing what
is in the highest degree injurious if there is no marriage." ·
1 Bish. Mar. & Div., secs. 327, 334, 383; Barnett v. Kimmell,
35 Pa. 13.

Looking now, in the light of these principles, at the facts
and circumstances disclosed by the evidence herein, what did
the parties intend at the time the sealing ceremony was per-
formed?    Did they then mutually assent to and contract a
marriage under the law, or was it to be simply a marriage
for eternity, which the law does not recognize?    The evi-
dence clearly shows, and it is admitted, that a sealing cere-
mony was performed, and that both parties mutually con-
sented to it.    The proof likewise shows that the sealing cere-
mony, whether it was for time and eternity, or merely for
eternity, as claimed by the respondent, was performed under
an ordinance of the Mormon Church, by an official thereof
who was fully authorized to officiate on such occasions. Both
parties were members of that church, and believed in its doc-
trines.    From the testimony of the plaintiff, it appears that,
both before and for some time after the performance of the
ceremony, the relations of the parties were quite intimate;
that on their voyage and at New York, Dr. Park was very
attentive to her; that in Salt Lake City, and while on her
bed of sickness, he visited her quite frequently; that she was
assured by the witness Mrs. Young, at whose house she lay
sick, that the doctor wished to make her his wife, and was

advised to be sealed to him, being told that she might die, and that it would be better for her to be sealed to some good man, as it would make her position in the next world more exalted; that at the ceremony by the bedside they joined their right hands; that the officiating clergyman then asked the doctor whether he was willing to take her (the plaintiff) to be his "lawful wedded wife," and received an affirmative reply; that to a similar inquiry the plaintiff gave an affirmative answer; and that, after some further ceremony by the clergyman, they were pronounced husband and wife. It is true, several witnesses testified that at the time of the performance of the ceremony the plaintiff appeared to them as if she were unconscious, but the clearness with which she has described the details of the occurrence, many of them being fully corroborated by other witnesses and the surrounding circumstances shown by the testimony, impel the conclusion that the plaintiff was not only conscious, although very sick, but fully understood what was going on. It will be noticed, upon reference to the testimony, that the witness Mrs. H. C. Wells, who was present at the sealing ceremony, said: "I only remember that there was a ceremony, and that they were married." Upon the ceremony having been performed, the person officiating issued a certificate stating that the "parties were sealed," which certificate was recorded in the office of the church historian.

Without further reference to the evidence in detail, there can be no doubt that both parties intended to be "sealed," whatever that may include, and that they both mutually consented to the sealing ceremony. Whether sealing, as an ordinance of the church of which both the parties were members, embraces the marriage status, under the laws of matrimony, or whether it instituted simply a marriage, under the doctrines peculiar to that church, for eternity, remains to be seen. The respondent insists that the parties did not agree or consent to be husband and wife during their joint lives, but only to

be husband and wife after both were dead; and, if this be true, then the occurrence was simply something of which the law takes no cognizance, and by which neither one was legally bound. The parties, however, must be held to have consented to and intended whatever their language and acts fairly and legitimately indicate. The most important subject of inquiry on this branch of the case, therefore, is what was meant by the term "sealed," or "sealing ceremony." This point was made an issue in the pleadings, for the plaintiff alleged marriage, and the defendant denied marriage, but admitted that the parties were sealed in accordance with a tenet of the Mormon Church. The question then immediately arose as to whether or not such a sealing constituted a valid marriage. At the trial the testimony introduced to show the meaning of the term "sealed," or "sealing ceremony," was very meager and wholly unsatisfactory. It is true, several witnesses attempted to state what was meant by the word "sealing," and the respondent contends that their evidence preponderates to the effect that sealing did not mean marriage; but when it is considered that none of them were shown or appear to be qualified to speak upon the subject, and that not a single officer of the church who was qualified was put upon the stand, although the issue was raised affirmatively by the defense, the testimony in question can be regarded as of little, if of any, importance in the determination of what is the meaning of those terms. Counsel for the respondent refer to Webster's definition of the word "seal," as used in common parlance, but what light can Webster's definition throw upon this subject? Its ordinary use is easily comprehended, but here it has a particular meaning assigned to it by the Mormon Church, by the authority of which church the ceremony was performed, and the meaning of the term which was thus given to it by the church must determine the sense in which it was and is used in the performance of the sealing ordinance. The church, as an organized ecclesiastical body, had the right to declare

and adopt tenets, rules, and ordinances, not inconsistent with or repugnant to the laws of the land, for its own governance and the guidance and conduct of its members; and the same are binding upon the members, and will be respected by the courts in passing upon questions relating to ecclesiastical affairs. When, therefore, the parties, in the present instance, who were both members of that church, were sealed according to the tenet thereof, they became bound by the relations of husband and wife, under the law of matrimony, if, in accordance with the particular significance given to the word "sealed," the sealing included those relations. And if by the sealing ceremony, and assent thereto, a marriage was solemnized for time as well as for eternity, then the marriage is good, and must be respected by the civil courts, notwithstanding that part of the contract and ceremony which related to eternity, for that may be regarded as mere surplusage. In Baxter v. McDonnell, 155 N. Y. 83, 49 N. E. 667, 40 L. R. A. 670, which was an action by a priest against a bishop of the Holy Roman Catholic Church to recover an alleged sum due him as salary, it was said: "When an individual joins an incorporated club or legally organized body, with power to make laws and rules for its own government and for the regulation of the conduct of its members, the member becomes bound by those laws and rules; and a decision by the body or a duly constituted committee, proceeding according to judicial forms, touching his rights or relations as a member, is binding upon the courts. . . . He can always insist, of course, that his civil or property rights as an individual or citizen shall be determined according to the law of the land; but his relations, rights, and obligations arising from his position as a member of some religious body may be determined according to the laws and procedure enacted by that body for such purpose."

The proof as to the meaning of the term "sealed," or "sealing ordinance," being unsatisfactory, the only other

source of information would seem to be works of history and church records and journals; but counsel, for the respondent insist that such works should not be considered by this court. It seems that they were offered in evidence and excluded under section 3400, Revised Statutes. We are of the opinion that the works offered were admissible under that section of the statutes. As they were excluded, however, are we precluded from reference to them to ascertain the particular meaning or sense in which the Mormon Church used the term ".sealed," or "sealing ceremony?" We think not. Courts will take judicial notice of matters of history, of the contents of the Bible, of the fact that there are various religious sects, of the creed and general doctrine of each sect, and hence will take notice of the creed and general doctrine of the Mormon Church, and of the principle of "celestial marriage," peculiar to the Mormon sect. These are matters of general history, and may fairly be presumed to be subjects of common knowledge, of which the courts take notice without proof of the facts. In its general incidents, Christianity has been declared to be a part of the common law, and courts, of their own motion, will take notice of the law. We must assume knowledge by the courts not only of the revealed laws of God, but also of His natural laws, which have been demonstrated by science or admitted by experience. In State v. District Board of School Dist. No. 8 of City of Edgerton, 44 N. W. 967, the Supreme Court of Wisconsin said: "The courts will take judicial notice of the contents of the Bible, that the religious world is divided into numerous sects, and the general doctrines maintained by each sect; for these things pertain to general history, and may fairly be presumed to be subjects of common knowledge. Thus they will take cognizance, without averment, of the facts that there are numerous religious sects called 'Christians,' respectively maintaining different and con-

flicting doctrines; that some of these believe the doctrine of predestination, while others do not; some, the doctrine of eternal punishment of the wicked, while others repudiate it; some, the doctrines of the apostolic succession and the authority of the priesthood, while others reject both; some, that the Holy Scriptures are the only sufficient rule of faith and practice, while others believe that the only safe guide to human thought, opinion, and action is the illuminating power of the divine spirit upon the humble and devout heart; . . . . . . and, further, that the sect known as the 'Latter-Day Saints,' or 'Mormons,' while accepting the Bible, is reputed to believe the Book of Mormon, and the deliverances of its own alleged prophets, to be of equal authority therewith." 1 Whart. Ev., secs. 282-284, 328-330; 1 Greenl. Ev., secs. 5, 6, and notes.

Having thus determined that we can take judicial notice of the works of history and theology offered in evidence and rejected, it now behooves us to ascertain what the particular meaning of the word "sealed" is, according to historical and the theological authority of the Mormon Church, and also to ascertain whether a "sealing ceremony" performed as in the case at bar, under and by virtue of the authority of the church, effects a marriage for time and eternity, or merely for eternity, and whether such a ceremony is ever performed for eternity only. Counsel for the respondent insist that, according to those theological authorities, this ceremony relates to eternity or the future life, and that the relations established by the sealing ordinance may begin after death. Upon careful examination, we are of the opinion that this position is not sound. In 1 Whitney, Hist. Utah, p. 212, speaking of the doctrine of celestial marriage, the author said: "It was to the Latter-Day Saints the key to the celestial kingdom, where according to their faith, family relationships formed on earth according to divine law will be perpetuated. Hence the revelation enjoining celestial mar-

25 Utah—10

riage was entitled, 'Revelation on the Eternity of the Marriage Covenant, Including Plurality of Wives.' " How can "family relationships" be formed on earth, and "perpetuated" in the celestial kingdom, if they are not to begin until both parties are dead? Evidently the historian meant that a marriage by authority of the church was for both time and eternity. The revelation referred to relates to the eternity of the "marriage covenant," and doubtless refers to all marriages solemnized by authority of the church, whether monogamous or plural. This will more clearly appear from the revelation itself, paragraph 1 of which reads:

"Verily, thus saith the Lord unto you, my servant Joseph, that inasmuch as you have inquired of my hand, to know and understand wherein I, the Lord, justified my servants Abraham, Isaac and Jacob; as also Moses, David and Solomon, my servants, as touching the principle and doctrine of their having many wives and concubines."

In this paragraph, as will be noticed, the doctrine of a plurality of wives is mentioned, and the word "wives" is used as a general term, and includes the first wife as well as plural wives.

Paragraph 4 states:

"For behold! I reveal unto you a new and everlasting covenant; and if you abide not that covenant, then are ye damned; for no one can reject this covenant, and be permitted to enter into my glory."

Here notice of a new and everlasting covenant is given, and a penalty fixed for disobedience thereof. The penalty is that those who do not abide by the covenant will be "damned." The new covenant referred to is that of marriage, or "celestial marriage," as it has been characterized.

Paragraph 7 reads:

"And verily I say unto you, that the conditions of this law are these: All covenants, contracts, bonds, obligations, oaths, vows, performances, connections, associatons, or ex-

pectations, that are not made, and entered into, and sealed by the Holy Spirit of promise, of him who is anointed, both as well for time and for all eternity, and that, too, most holy by revelation and commandment, through the medium of mine anointed, whom I have appointed on the earth to hold this power (and I have appointed unto my servant Joseph to hold this power in the last days, and there is never but one on the earth at a time, on whom this power and the keys of the priesthood are conferred) are of no efficacy, virtue or force, in and after the resurrection from the dead; for all contracts that are not made unto this end, have an end when men are dead."

Here is revealed how the new covenant shall be made and performed, by or through whom it must be performed or "sealed," and its duration. In this paragraph also appears the reason for sealing in marriage, which is that the family union, the relations of husband and wife, may continue in effect in the eternal world.

In paragraph 18 it is said:

"And again, verily I say unto you, if a man marry a wife, and make a covenant with her for time and for all eternity, if that covenant is not by me, or by my word, which is my law, and is not sealed by the Holy Spirit of promise, through him whom I have anointed and appointed unto this power—then it is not valid, neither of force when they are out of the world, because they are not joined by me, saith the Lord, neither by my word."

This states, probably more clearly, what is implied in paragraph 7, that a marriage by contract or covenant for time and eternity, not sealed by the Holy Spirit of promise, through the "anointed," is not valid, nor of force when the parties are out of the world.

In paragraph 19 occurs this language:

"And again, verily I say unto you, if a man marry a wife by word, which is my law, and by the new and everlast-

ing covenant, and it is sealed unto them by the Holy Spirit of promise, by him who is anointed, unto whom I have appointed this power, and the keys of this priesthood; and it shall be said unto them, ye shall come forth in the first resurrection; and if it be after the first resurrection, in the next resurrection; and shall inherit thrones, kingdoms, principalities, and powers, dominions, all heights and depths —then shall it be written in the Lamb's Book of Life, that he shall commit no murder whereby to shed innocent blood."

Here it affirmatively appears that if a marriage is by the "new and everlasting covenant," and is sealed as provided in the revealed law, it will be of force forever, and the promise is that the parties "shall come forth in the first resurrection," and "shall inherit thrones, kingdoms, principalities," etc., and shall be exalted and glorified in eternity.

And in paragraph 61 the language is:

"And again, as pertaining to the law of the priesthood: If any man espouse a virgin, and desire to espouse another, and the first give her consent; and if he espouses the second, and they are virgins, and have vowed to no other man, then is he justified; he can not commit adultery, for they are given unto him; for he can not commit adultery with that that belongeth unto him and to no one else."

As will be observed, this paragraph refers to plural marriages, and shows that they are justified by and are of force under the revelation, and that cohabitation, after sealing or marriage, is not considered adulterous.

The revelation, comprising 66 paragraphs, is found in section 132, Book of Doctrines and Covenants of the Mormon Church, and is entitled: "Revelation on the Eternity of the Marriage Covenant, Including Plurality of Wives. Given through Joseph, the Seer," etc. And we have not been referred to, nor have our researches disclosed, any other law or regulation of the Mormon Church for the solemnization of marriages of its members. It must therefore be regarded

as the ecclesiastical law for contracting and solemnizing all marriages which are celebrated through the instrumentality of that church. The revelation made known the way, and, so far as we have been able to ascertain, the only way, in which marriages can be contracted and solemnized among Latter-Day Saints, to be valid and of force in the hereafter. As will be noticed, it expressly declares that all such covenants, contracts, bonds, etc., "that are not made and entered into and sealed by the Holy Spirit of promise, for time and all eternity," through the medium of the "anointed" who is appointed on the earth to hold this power (and "there is never but one on the earth, at a time, on whom this power and the keys of this priesthood are conferred"), are of "no efficacy, virtue or force" after the contracting parties are dead. The revelation is not that the covenant must be sealed merely for time, nor yet alone for eternity, but both "for time and for all eternity," in order to possess efficacy, virtue, and force after death. The penalty for disobedience, as to this injunction, is that the guilty parties shall be "damned." It is thus clear, according to the revealed law, that, to be sealed was to be married for time and eternity, and that the sealing ceremony is a marriage ceremony, which is good at common law; the part referring to eternity, as we have seen, being regarded as simply surplusage. It seems also clear, upon careful scrutiny, that neither a sealing nor marriage for time, whereby the parties are to become husband and wife for this world only, nor a sealing or marriage for eternity, whereby the parties are not to become husband and wife until after death (that is, in the next world), was authorized by this revealed law; and hence any and all such unauthorized marriages would be a violation of the revelation, and would subject the contracting parties to the penalty provided as for disobedience, for the express revealed covenant is that sealing or marrying shall be for time and eternity.

Now, the evidence in the case at bar discloses the fact that both parties to the sealing ceremony were members of the Mormon Church, and believed in its doctrines and tenets. We must therefore assume that, as viewed by them, the revelation was of divine origin, sacred and binding in conscience. Such being the case, and it being not only admitted, but urged, by the respondent, that the object of the sealing ceremony was to secure a more exalted position in eternity for the woman who was supposed then to be on her deathbed, would it be reasonable, under all these surrounding circumstances, to hold that the parties knowingly contracted and consented to a marriage condemned by the supreme law of the church which they revered, and which marriage, instead of exalting the woman, would subject both of them to punishment forever in the next world? In our judgment, no such result is indicated by the weight of the evidence; nor as we have seen, is it warranted because of the fact that the parties were simply sealed in accordance with a tenet of their church. Lest there might be some doubt, however, as to our interpretation of the revelation concerning celestial marriages, let us see how the authorities of the church interpreted the revealed law, and what meaning they attached to the terms "sealed" and "sealing ceremony." Speaking on the subject of marriage or sealing, Brigham Young, president of the Church of Jesus Christ of Latter-Day Saints, in February, 1868, among other things said: "The Lord says, 'Let my servants and handmaidens be sealed, and let their children be sealed.' This great and happy government under which we have lived so long says we shall not perform the ordinance of sealing." On that occasion he also said: "The ordinance of sealing must be performed here." 12 Jour. Disc., pp. 164, 165. Upon the same subject, President Young, in a discourse delivered May 8, 1870, said: "I will say a few words on a subject which has been mentioned here; that is, celestial marriage. God has given a revelation to

seal for time and for eternity, just as he did in the days of old. In our own days he has commanded his people to receive the new and everlasting covenant, and he has said, 'If ye abide not that covenant, then are ye damned.' We have received it." 14 Jour. Disc., p. 43. Again, speaking upon the same subject, in a discourse delivered August, 1873, President Young used the word "sealed" in the same sense as "marriage." 16 Jour. Disc., pp. 166, 167. On another occasion, in a discourse, delivered June 28, 1874, President Young, speaking in relation to marriage and divorce, said: "I say to my sisters in the kingdom, who are sealed to men, and who say, 'We do not want this man in eternity, if he is going to conduct himself there as he does here,' there is not the least danger in the world of your seeing him in eternity, or of his seeing you there, if he proves himself unworthy here. But if he honors his priesthood, and you are to blame and come short of doing your duty, and prove yourself unworthy of celestial glory, it will be left to him to do what he pleases with you. You will be very glad to get to him if you find the fault was in yourself and not in him. But if you are not at fault, be not troubled about being joined to him there, for no man will have the privilege of gathering his wives and children around him there unless he proves himself worthy of them." On the subject of divorces he said: "I tell the brethren and sisters when they come to me and want a bill of divorce that I am ready to seal people and administer in the ordinances, and they are welcome to my services; but, when they undertake to break the commandments and tear to pieces the doings of the Lord, I make them give me something. I tell a man he has to give me ten dollars if he wants a divorce. For what? My services? No; for his foolishness. If you want a bill of divorce, give me ten dollars, so that I can put it down in the book that such a man and such a woman have dissolved partnership. Do you think you have done so when you have obtained a bill

of divorce? No; nor ever can if you are faithful to the covenants you have made. It takes a higher power than a bill of divorce to take a woman from a man who is a good man and honors his priesthood. It must be a man who possesses a higher power in the priesthood, or else the woman is bound to her husband, and will be forever and ever. You might as well ask me for a piece of blank paper for a divorce, as to have a little writing on it, saying, 'We mutually agree to dissolve partnership and keep ourselves apart from each other, etc. It is all nonsense and folly. There is no such thing in the ordinances of the house of God. You can not find any such law. It is true, Jesus told the people that a man could put his wife away for fornication, but for nothing short of this." 17 Jour. Disc., pp. 118, 119. Can it be doubted that President Young, in his use of the word "sealed," meant "married"? Unquestionably he referred to the marriage status, and used that word with reference to those who had assumed the relations of husband and wife. So, President Taylor, while yet an elder of the church, in preaching a funeral sermon, December 31, 1876, said: "We then come to the sealing power. Here, say, is a man and a woman who have been sealed together for time and eternity. Does it mean anything? If it means anything, which it certainly does, it means just what it says. If the husband of this our departed sister continues faithful to the end, maintains his integrity to God, and fights the good fight of faith, he will claim her in eternity, and they twain will be one flesh. This young man, some one will have to act for him over the marriage altar in having some one sealed to him." 18 Jour. Disc., p. 334. And after he became president of the church, in a discourse speaking on the subject of celestial marriage, he said: "God has revealed, through His servant Joseph Smith, something more. . . . He has revealed unto us the law of celestial marriage, associated with which is the principle of plural marriage." And again he said: "It is

not enough for men to be married to wives, and be sealed according to the order of God. They must treat them aright when they have them." 24 Jour. Disc., pp. 229, 231. Likewise, President Wilford Woodruff, in a discourse delivered July 20, 1883, speaking on the same subject, said: "So I will say to our friends here—the strangers within our gates—that any man that marries a wife by any authority other than the authority of the holy priesthood is simply married for time, 'or until death do you part.' When you go into the spirit world you have no claim on your wife and children. The ordinance of having them sealed to you by one having authority of the holy priesthood must be attended to in this world. Father Abraham obeyed the law of the patriarchal order of marriage. His wives were sealed to him for time and all eternity, and so were the wives of all the patriarchs and prophets that obeyed the law." Is it not manifest that these presidents of the church all used the word "sealed" in the same sense as "married"? So Elder Orson Pratt, well known for his ability in expounding the principles and doctrines of the Mormon Church, in a discourse delivered July 11, 1875, speaking on the subject of celestial marriage, said: "It seems, then, that if we wish to fulfill the object of our creation, and if we are truly in the Lord, we must go into the eternal world as married, not for time, not by some justice of the peace that is an infidel, not by a man that has no right to join us together under the revelation and authority of the Most High, but we must be married for eternity by a man who has the right to speak, being commanded of the Lord, holding the keys of authority and power, who can say to the man and woman, 'I pronounce you husband and wife for time and all eternity.' Then you will be married according to the pattern given. Then you will have a claim upon each other after death. But have married people, in the nations, a claim upon each other after death? I mean those who have not been married after the pattern and authority of heaven.

By no means. Their contracts are made only for a little space—some twenty, thirty, fifty, or seventy years, as the case may be. Then death comes along, and the contract runs out; and when you come in the resurrection, who are you? Have you any wife there? Oh, no. Why not? Because you were not sealed or married to each other by Divine authority. That is the reason." Again he said: "The word of the Lord told you to gather up here. What for? That you might, among other things, be married according to the law of God. I am endeavoring to tell you some of our peculiarities. We do believe that every man who gathers up with the saints, whether married by the gentile law or not, should be married by one holding divine authority to officiate, and thus have the ordinance, the ministration, sealed on earth, that it may be sealed in the heavens." 18 Jour. Disc., pp. 49-51. Likewise, in the Articles of Faith, p. 457—a work written by Dr. James E. Talmage, by appointment, and published by the church—respecting celestial marriage it is said: "Marriage, as regarded by the Latter-Day Saints, is ordained of God, and designed to be an eternal relationship of the sexes. With this people it is not merely a temporal contract to be of effect on earth during the mortal existence of the parties, but a solemn agreement which is to extend beyond the grave. In the complete ceremony of marriage, as prescribed by the church, the man and the woman are placed under covenant of mutual fidelity—not 'until death do you part,' but 'for time and for all eternity.' A contract as far-reaching as this, extending not only throughout time, but into the domain of the hereafter, requires for its validation an authority superior to that of earth; and such an authority is found in the holy priesthood, which, given of God, is eternal." In the Key to Theology, by Parley P. Pratt (pages 162-163), the doctrine is stated thus: "All vows, covenants, contracts, marriages, or unions not formed by revelation and sealed for time and all eternity, and recorded in the holy

archives of earth and heaven by the ministration of the holy and eternal priesthood, will be dissolved by death, and will not be recognized by the eternal authorities after the parties have entered through the vail into the eternal world. This is heaven's eternal law, as revealed to the ancients of all ages, who held the keys of eternal priesthood, after the order of the Son of God, and as restored with the priesthood of the saints of this age." In addition to the 'authorities already cited and quoted from, see 19 Jour. Disc., pp. 163, 164; 21 Jour. Disc., pp. 292-296; 23 Jour. Disc., p. 132; Robert, Outlines Ecc. Hist., p. 426; Richards, Compendium, pp. 131-133; Historical Record (Ch. Enc.), pp. 514, 529.

In the light of these authorities, can there be any doubt that in Mormon Church parlance "sealed" means the same thing as the word "married," or that a "sealing ceremony" is with the Latter-Day Saints a "marriage ceremony?" Is it not apparent that by them these terms are used interchangeably and are synonymous? With them, whether the solemnization of the covenant of marriage be called a "sealing ceremony" or a "marriage ceremony," it means the same. In either case it establishes the marriage status, and creates the relations of husband and wife. In either case the contracting parties are bound for time and all eternity; and this, as is obvious from the authorities quoted and referred to, is the light in which a Mormon marriage was viewed by the presidents of the church, and is viewed by those speaking by authority. In the mind of a Mormon, when such a marriage is celebrated, "the woman," as said by President Young, "is bound to the husband, and will be forever and ever." It is true that, when compared with a marriage solemnized outside the pale of the church, a sealing embraces more than such a marriage, in that it is for eternity as well as for time; but the effect of each is the same at common law, or the law of matrimony, at all events, in the absence of a statute prescribing a different ceremony. Singular and pe-

culiar as such a ceremony may seem, yet it is sufficient, under the law, and evidently the Latter-Day Saints accept the doctrine as of divine origin and as a part of their religious faith; and when, as in the case at bar, the sealing ceremony has been performed, with the mutual consent of the contracting parties, by one properly authorized to perform it, the marriage status is created, with all the marital rights and duties pertaining thereto by virtue of the laws of the land. Cohabitation may immediately follow as an incident to the marriage, but it is not compulsory; and the parties may cohabit or not, as they may mutually agree, without affecting their status. Seeing, thus, that the revelation concerning celestial marriages constitutes the only law on the subject of marriage in the Mormon Church; that such law provides but one form of marriage, the same being for time as well as for eternity; that, according to the interpretation of the church, "to be sealed" means "to be married," and a sealing ceremony is a marriage ceremony, and creates the relations of husband and wife; and that these things were so when the ceremony in the present case was performed—how can it be successfully or justly maintained that Dr. John R. Park, a known scholar, a man not only of honor, but of high intellectual attainments, himself an able interpreter of language, and a devout member of the church, consented simply to a sealing ceremony, to take effect in the world to come, but not in this world? If this were established, would it not be a reflection upon his memory? Dr. Park, as a member of the church, must be presumed to have known what the laws and regulations of his church were, and what a sealing ceremony meant. Especially is this so as to a man of his attainments, and thus, if the contention of counsel for the respondent that the doctor did not intend to marry the plaintiff for time, but simply consented to be married or sealed for eternity, were true, it would show him to have been guilty of fraud and deceit, and of conduct wholly unjustifiable; for it is shown that at the time of the ceremony

the bride was upon her supposed deathbed, and the purpose of the solemnization at that time was so that her position would be more exalted in the next world if she should die, and she had been so informed by a close friend, and assured that the doctor intended to make her his wife, and advised to accept him. Evidently the bride consented to the ceremony, believing it to be a marriage countenanced by the church of her faith. If, under these circumstances, the bridegroom, knowing that the marriage was then to be performed, so that the bride's position would be more exalted in the hereafter, had consented only to a marriage, which, according to the revealed law of their church, and which he must be held to have understood, and doubtless did understand, instead of exalting her position, would, as we have seen, subject both of them to condemnation in the world to come, his conduct would be absolutely indefensible upon any principle of justice. The facts, however, both those appearing in evidence, and those of which we have a right to take notice without proof, convince the mind that the bridegroom neither intended nor consented to a marriage condemned by the church, but that he understood it to be one authorized by it, and that it was for time and eternity. Without doubt, his motives were pure. The testimony respecting the conversation the doctor had outside of the sick room, and without the hearing of the bride, concerning the seriousness of her condition, etc., questionable as its admission appears, establishes nothing to the contrary as to his motives, or as to his consenting to a lawful marriage, and we can not accept the construction which counsel for the respondent have placed upon it. Very likely he would not have consented to the performance of the sealing ceremony at that time and place if he had not been advised that she could not recover, because he did not wish to take any advantage of her condition, and because of the fact that, under the regulations of the church, members were to be sealed in the endowment house. His anxiety and motives are explained by what took

place between him and the officiating clergyman at the begin-
ning of the ceremony, when he was asked: "Are you ready,
doctor," and he answered, "Yes, Brother Wells; but I want it
understood that I will take no advantage of this sick.girl. If
she was in health, I might be the last of her choice." This
was the declaration of an honest and sincere man. It was
testified to by the plaintiff, and is uncontradicted. So, the in-
cident after the ceremony, respecting the intimations in his
presence that she might recover, might naturally have caused
some annoyance, because upon regaining her health she might
regret the marriage. But why annoyed, if, as is urged, there
was simply a sealing for the next world? Does not that cir-
cumstance itself tend to show that the doctor all the while
understood that the sealing ceremony was a lawful marriage?
Aside from all these things, however, the church divorce,
which was introduced in evidence, it would seem, shows be-
yond reasonable controversy that Dr. Park, as well as the
plaintiff, regarded the transaction as a valid marriage; for
therein, by their own language, and under their own signa-
tures, they admitted not only that the were married and were
bound by the relations of husband and wife, but promised and
agreed to dissolve those relations, and to keep separate and
apart from each other from that time forth. That to them
was a solemn instrument, the same being recognized by the
authority of the church, and shows the construction which the
parties themselves placed upon the sealing ceremony, which
was that they were married and bound as husband and wife.
They having thus construed their own contract, this court has
the right to adopt the same construction; it being also war-
ranted by the facts.

It would seem useless to pursue this subject further.
Its intricacies and importance, touching the validity of mar-
riages in this State, and the resultant property rights, im-
pelled us to bestow upon its consideration careful thought
and research. As a result of our investigations, the conclu-

sion that the sealing ceremony performed in this case established the marriage status and created the relations of husband and wife is irresistible.

The marriage, then, having been lawfully created, was it in force at the time when the respondent purchased the property in dispute? This question must be answered in the affirmative, unless the marriage status had previously been lawfully dissolved. The only thing, so far as shown by the evidence, that had ever been done toward dissolving it, was the procuring of the church divorce, to which reference was hereinbefore made. That divorce counsel for the respondent, themselves admit to be null and void, because, while the church could solemnize a marriage, it had to no power to dissolve it. Such was the decision of this court in Norton v. Tufts, 19 Utah 470, 57 Pac. 409, where a like divorce granted by the same church was in question. Nor is there anything to show that the marriage contract was ever dissolved previous to the death of the husband. The mere fact that both parties believed the church divorce to be valid, and that the plaintiff, so believing, thereafter became a party to another marriage ceremony, did not dissolve her former marriage. Such being the case, upon the death of Dr. Park she became his lawful widow, and entitled to her share in his estate as such widow.

Nor does the record show such laches on her part as to estop her from claiming such share. Nor, under the circumstances disclosed in evidence, is she now estopped from asserting her marriage with Dr. John R. Park, or from denying the legality of her subsequent marriage.

We are of the opinion that the finding and holding of the court that the plaintiff and Dr. John R. Park were never married, and that she is entitled to no part of the estate of the deceased, are so manifestly erroneous that they can not be upheld; and the case must therefore, be reversed, with costs, and the cause remanded, with directions to the court below to set

aside its findings and decree, and enter new findings and decree in accordance herewith. It is so ordered.

MINER, C. J., and BASKIN, J., concur.