(March 24, 1908.)

# DUDLEY D. TONCRAY, Appellant, v. ALFRED BUDGE, Respondent.

[95 Pac. 26.]

REPEALED STATUTES—JURISDICTION AT LAW AND IN EQUITY—ELECTION
    CONTESTS—ELECTION CONTESTS NOT A JUDICIAL QUESTION—JURIS-
    DICTION OF ELECTION CONTESTS—QUO WARRANTO—JURISDICTION OF
    PROCEEDINGS IN QUO WARRANTO—CONSTITUTIONAL LAW—SELF-OPER-
    ATIVE PROVISIONS—ELECTIVE FRANCHISE—BIGAMY AND POLYGAMY
    —CELESTIAL AND PATRIARCHAL MARRIAGES—MARRIAGES FOR TIME
    ONLY—MARRIAGES FOR TIME AND ETERNITY—CONSTRUCTION OF SEC.
    3, ART. 6, CONSTITUTION—PROHIBITION AGAINST BIGAMOUS AND
    POLYGAMOUS MARRIAGES—PROHIBITION EXTENDS TO ACTS, PRAC-
    TICES AND TEACHINGS, AND NOT TO BELIEFS.

1. By the act of February 2, 1899 (Sess. Laws 1899, p. 33), pro-
viding for the holding of elections and for election contests, all ter-
ritorial statutes in relation to elections and election contests were
repealed, and the same are no longer in force or effect.

2. At the time of the adoption of the state constitution, the rem-
edy provided for the contesting of elections in certain cases was
classed and distinguished as ''a special proceeding of a civil
nature,'' and was not classed among ''cases or actions either at
law or in equity.''

3. At common law an election contest, as such, was unknown, and
all the provisions or authority existing within this state for contest-
ing an election are dependent upon statute alone.

4. At the time of the adoption of the constitution of this state,
an election contest, as such, was neither recognized by the common
law nor the statute law as a ''case either at law or in equity,'' and
such a proceeding is therefore not necessarily included within the
original jurisdiction of district courts, as that jurisdiction is con-
ferred by sec. 20 of art. 5 of the constitution.

5. An election contest is of purely statutory origin, and is within
the direction, control and management of the political power of the
state, and the manner of conducting such a contest and of deter-
mining the questions arising thereunder is within the authority and
control of the political power of the state government as distin-
guished from the judicial power and authority thereof.

6. Under sec. 124 of the act of February 2, 1899, in reference to
elections and the contest of elections, the supreme court has original
jurisdiction in the matter of a contest of the election of a district
judge.

7. Under the constitution of this state, it is competent for the legislature to authorize the contesting of elections and to prescribe the manner and method of conducting the same, and to establish or designate the court, body, board or tribunal before which such contests shall take place.

8. It would not be competent for the legislature, under the name or guise of an election contest, to authorize a board or body other than the duly and regularly constituted constitutional judicial tribunals to inquire into and pass upon a constitutional question or a constitutional ineligibility to hold office and make such inquiry and investigation final and conclusive.

9. The writ of *quo warranto* was a common-law remedy, and is covered by and included in secs. 4612 to 4619, Rev. Stat. of this state, which provide for an information in the nature of *quo warranto* to inquire into the authority by which a person holds or exercises an office or franchise, and those provisions of the statute are still in force in this state, and the jurisdiction to be exercised under these provisions of law falls within the category of ''cases both at law and in equity'' as used in sec. 20 of art. 5 of the constitution.

10. In proceedings by information in the nature of *quo warranto,* under secs. 4612 to 4619, Rev. Stat., the district courts of this state have original jurisdiction.

11. In proceedings on information under secs. 4612 to 4619, Rev. Stat., the action must be prosecuted in the name of the people of the state against the usurper or intruder, and must be brought by or on the relation of the district attorney of the proper county or of the attorney general of the state, except in the single instance where a person claims himself to be originally entitled to the office, in which case he may prosecute the action in his own name.

12. Where an action in the nature of *quo warranto* is sought to be prosecuted under secs. 4612 to 4619, Rev. Stat., and the same is not prosecuted by or on relation of the attorney general or the proper county attorney, it is necessary for the plaintiff to show some good cause why the same is not so prosecuted, and obtain the permission and consent of the court to act as the relator himself and prosecute the action.

13. It is contrary to the spirit and purpose of the ancient writ of *quo warranto,* and its modern form of information in the nature of *quo warranto,* to allow the action to be prosecuted promiscuously by any and every elector.

14. The remedy provided for by secs. 4612 to 4619, Rev. Stat., for an information in the nature of *quo warranto,* is for the protection of the public in its governmental and sovereign capacity, and for the benefit of the community or state at large rather than for the gratification, satisfaction or protection of any particular individual, except it be one who is himself entitled to the office.

15. Sec. 3 of art. 6 of the constitution is self-operative and self-acting, and needs no legislation to carry its provisions into effect.

16. No one can exercise the elective franchise, serve on a jury or hold any civil office within this state who comes within the inhibitions of sec. 3 of the ''Suffrage and Elections'' article of the state constitution.

17. The only safe and reasonable way in which to interpret and construe language used in a constitutional provision, is to read it in the light of the known condition of affairs and circumstances existing at the time of its adoption and against which its provisions were directed, and in doing so the court will look to the public history of such time as the same can be gathered from the press, public writings and the current literature of that time.

18. The principal and primary object of the people and their representatives in the constitutional convention in adopting sec. 3 of art. 6 was to suppress and forever prohibit and discountenance bigamy and polygamy in the state of Idaho, under whatever name or distinction it might be given, and under whatever doctrine or creed it might be recognized, taught or practiced by any person or organizations.

19. At the time of the holding of the constitutional convention, the Church of Jesus Christ of Latter-Day Saints, commonly called the Mormon Church, recognized two kinds of marriages, one for *time* only, or for this life only, and the other for both *time* and *eternity*, or for this life and the life hereafter, and it was the intention of the framers of the constitution and the people in its adoption, to prohibit plural marriages of either kind; but the prohibition only extends to the natural life of the parties and to this civil and temporal government.

20. Constitutions and statutes are drafted and adopted for the government of men and the regulation of their conduct in a civil and temporal government of human beings in this life. Constitutions and statutes care nothing about what men believe with reference to a future existence; indeed, they are intended in this American Union to protect a man in anything he wants to believe in reference to the future life. They do not deal with *beliefs,* but with *acts* and *practices* and *teachings.* They protect a man in his religious beliefs, but they prohibit him from acting or practicing or teaching anything in any manner contrary to good morals and the · public weal as prescribed by the laws of the land.

21. Celestial and patriarchal marriages to be participated in in the next world or the future life cannot be crimes here and in this life under a civil and man-made government, but whenever, under such names or designation or any other name, a man takes unto himself more than one wife during any given period of time, such

marriages become bigamous or polygamous, and are prohibited by the organic law of the state.

22. There was no objection at the time of the adoption of the constitution, and can be no constitutional one now, to a man believing that the wife to whom he is married in this life will continue to be his wife throughout eternity, and there can be no objection to his marrying her for both "time and eternity," but what the constitution objects to and forbids, is a man having more than one wife at any one and the same time, whether he be married to her for "time only" or for "all time and eternity."

23. The fact that a man belongs to a church or organization that teaches that marriage ceremonies celebrated by its duly authorized officers or ecclesiastics remain in force and effect during both this life and all eternity does not disqualify him for an elector so long as such church or organization does not teach or countenance more than one of such marriages for the same person during the same period of time so as to make such marriage bigamous or polygamous.

24. The framers of the constitution and the people in its adoption, in employing the words "bigamous," "polygamous," "plural," "celestial" and "patriarchal" marriages, meant and intended to prohibit a man having more than one wife at any time under whatever name or designation he might choose to style his marriage, and the use of each of those words was directed against bigamous and polygamous marriages.

25. A celestial or patriarchal marriage, in order to come within the prohibition of the provisions of the constitution, must also be bigamous or polygamous.

26. It was not intended by the constitution to in any manner interfere with the religious beliefs and opinions of anyone. The constitution was directed against acts, practices, and teachings with reference to this life, and not against beliefs and opinions in regard to a future life.

(Syllabus by the court.)

APPEAL from the District Court of the Fifth Judicial District, for the County of Bannock. Hon. J. M. Stevens, Judge of the Sixth Judicial District, presiding.

Proceedings on complaint of Dudley D. Toncray, an elector, to contest the election of Hon. Alfred Budge as Judge of the Fifth Judicial District. Judgment for the defendant and plaintiff appeals. *Affirmed.*

Richards & Haga, for Appellant.

Under the specific grant of power contained in secs. 9 and 10, art. 5, of the constitution there is no possible ground upon which the supreme court can be said to have original jurisdiction of this case. Neither is it possible by legislation to enlarge that jurisdiction so as to include a case of this kind.

The constitutional limitation of the original jurisdiction of the supreme court is restrictive of any other original jurisdiction, the rule of construction of the constitution being that affirmative words declaring in what cases the supreme court shall have original jurisdiction must be construed negatively as to all other cases. (*Ex parte Vallandingham,* 1 Wall. 252, 17 L. ed. 589; *Martin v. Hunter,* 1 Wheat. 330, 4 L. ed. 97; *Lake v. Lake,* 17 Nev. 230, 30 Pac. 878; 6 Am. & Eng. Ency: of Law, 1048, citing many authorities.)

The question in this case, however, is not whether the supreme court has original jurisdiction of this action, but whether the district court has jurisdiction over it under the constitutional grant of power to the judicial department.

The word "case" is more comprehensive in meaning in common parlance than either "suit" or "action," and includes special proceedings unknown to the common law. (*Gold v. Vermont Cent. Ry. Co.,* 19 Vt. 478, 484.)

The use of the words "all cases" and "in law and equity" has been repeatedly construed by the supreme court of the United States, and in a number of important cases the principle has been laid down that the broadest and most liberal construction of their meaning must be sustained, in order to give the judicial power the force and scope with which the framers of the federal constitution evidently intended to clothe it. (*Cohens v. Virginia,* 6 Wheat. 264, 382, 5 L. ed. 257, 286; *Osborn v. Bank of United States,* 9 Wheat. 738, 2 L. ed. 204; *Cherokee Nation v. State,* 5 Pet. 25, 8 L. ed. 49; *Smith v. Adams,* 130 U. S. 167, 9 Sup. Ct. 566, 32 L. ed. 895; *Fong Yue Ting v. United States,* 149 U. S. 726, 13 Sup. Ct. 1016, 37 L. ed. 918; *Mayor v. Cooper,* 6 Wall. 247, 18 L. ed. 852.)

In the absence of special constitutional or statutory provisions to the contrary, the common-law courts have jurisdiction of all cases of contested election. (McCrary on .Elections, 3d ed., sec. 346.) The presumptions of law are in favor of the jurisdiction of courts of general jurisdiction. (17 Am. & Eng. Ency. of Law, 1073, and cases there cited.)

Secs. 5026 and 5042, Rev. Stat., give the district court jurisdiction of the subject matter of this action, and have not been repealed by the act of 1899.

In section 162 of the act of 1899, we find the following language: "All acts and parts of acts enacted by any territorial legislature relating to elections be, and the same are hereby, repealed."

The act beginning ·with section 5026, Rev. Stat., does not relate to elections, but to contests of elections.

The territorial legislature also enacted another act. (Chapters I to XII, Title 11, Pol. Code, Rev. Stat.) This last act certainly relates to elections, and was evidently the act intended to be repealed by the act of 1899.

The act of 1899 did not attempt to deprive the district court of the jurisdiction conferred by the constitution. (*Greathouse v. Heed,* 1 Ida. 494.)

"A general statute without negative words will not repeal the particular provisions of a former one unless the two are irreconcilably inconsistent." (*People v. Lytle,* 1 Ida. 146; 26 Am. & Eng. Ency. of Law, 719; *Noble v. Bragaw,* 12 Ida. 273, 85 Pac. 903.)

The act of 1899 (sec. 162) declares it is only intended to repeal any territorial act relating to election, which excludes the idea that it intended to repeal sec. 5042, Rev. Stat. (26 Am. & Eng. Ency. of Law, 718 et seq.)

If respondent was ineligible under our constitution, his election was void and gives him no right to hold the office of district judge. (26 Am. & Eng. Ency. of Law, 338, note 17; *People v. Woodbury,* 14 Cal. 44.)

Constitutional eligibility is a question the courts must determine under the general jurisdictional grant of power, and special tribunals created to hear and determine election con-

tests merely cannot deprive courts of general constitutional jurisdiction of such right. The eligibility of respondent under sec. 3, art. 6 of our constitution is a constitutional question, and the legislature has no power to take such jurisdiction from the court where this constitution placed it. (*People v. Woodbury,* 14 Cal. 46; *Ex parte Attorney General,* 1 Cal. 87.)

The statutory remedy of 1899 and the territorial act beginning with sec. 5026, Rev. Stat., are concurrent remedies with the territorial act beginning with sec. 4612, Rev. Stat. (17 Ency. Pl. & Pr. 423; *People v. Holden,* 28 Cal. 130; *People v. Londoner,* 13 Colo. 303, 22 Pac. 765, 6 L. R. A. 444; *State v. Fransham,* 19 Mont. 273, 48 Pac. 1.)

It is a general rule of law that in all these cases of special tribunals their jurisdiction is strictly confined, and never excludes the courts of ordinary jurisdiction, except upon the clearest direction of the legislative will. (*Fidelity Trust Co. v. Gill Car. Co.,* 25 Fed. 749, and cases cited.)

Sections 5026 to 5042, Rev. Stat., were in force at the time of the adoption of our constitution, and provided that any elector of a district had the right to bring proceedings to determine the right to hold office, and that the district court had jurisdiction thereof. In addition to this the constitution had granted the right to enforce this inhibition, and had granted jurisdiction to such courts as had original jurisdiction to enforce all self-executing constitutional provisions, and, therefore, no common-law restrictions or statutory enactments could prevent the enforcement of this right.

A constitutional provision designed to remove an existing mischief should never be construed as dependent for its efficacy and operation upon legislative will. (6 Am. & Eng. Ency. of Law, 913, n. 2, and cases cited; *Doon Tp. Co. v. Cummins,* 142 U. S. 366, 12 Sup. Ct. 220, 35 L. ed. 1044; *Oakland Pav. Co. v. Hilton,* 69 Cal. 482, 11 Pac. 3.)

The doctrine must be regarded as settled that all negative or prohibitory clauses in a constitution are self-executing. (*Law v. People,* 87 Ill. 385; *Illinois Cent. Ry. Co. v. Ihlenberg,* 75 Fed. 877, 21 C. C. A. 546, 34 L. R. A. 393; *Dill v. Ellicott,*

Fed. Cas. No. 3911, Taney, 233; *Oakland Paving Co. v. Hilton*, 69 Cal. 479, 11 Pac. 3; *DeTurk v. Commonwealth*, 129 Pa. St. 151, 15 Am. St. Rep. 705, 18 Atl. 757, 5 L. R. A. 853; 8 Cyc. of Law & Proc. 754 (citing many cases) ; *Katz v. Herrick*, 12 Ida. 1, 86 Pac. 873; *Hillard v. Shoshone Co.*, 3 Ida. 107, 27 Pac. 680; *Cunningham v. Moody*, 3 Ida. 125, 28 Pac. 395; *Day v. Day*, 12 Ida. 556, 86 Pac. 531.)

Clark & Budge, and Hawley, Puckett & Hawley, for Respondent.

This proceeding, under the statute, should have been commenced in the supreme court; therefore, the district court had no jurisdiction in the premises; it is a special remedy provided, and not a concurrent remedy, and to the statutory remedy alone must the contestant look for any relief. (15 Cyc. Law & Proc. 394, and notes.) Sec. 20, art. 6 of the constitution provides that the district court shall have original jurisdiction, both at law and in equity; but this constitutional provision does not extend to cases of this kind. (*Dickey v. Reed*, 78 Ill. 261; *Moore v. Hoisington*, 31 Ill. 243; *Clarke v. Jack*, 60 Ala. 271; *Clarke v. Rogers*, 81 Ky. 43; *State v. Dortch*, 41 La. Ann. 846, 6 South. 777.)

Where the legislature has acted, and has prescribed methods of contest, such methods are to the exclusion of all others. (*State v. Superior Court*, 14 Wash. 604, 45 Pac. 23, 33 L. R. A. 674; *Parmeter v. Bourne*, 8 Wash. 45, 35 Pac. 586; *Carter v. Superior Court*, 138 Cal. 150, 70 Pac. 1067; *Jennings v. Joyce*, 116 Ill. 179, 5 N. E. 534; *Linegar v. Rittenhouse*, 94 Ill. 208; *Reynolds v. Police Jury etc.*, 44 La. Ann. 863, 11 South. 236; 7 Ency. of Pl. & Pr. 377 et seq.)

Appellant has no standing in court whatever in this action, by reason of his noncompliance with the statute, in that he did not bring his contest in a court having jurisdiction; and therefore the decision of the court below must be affirmed.

An election contest is not a case in law or equity within the meaning of the constitution, but a special proceeding which may be referred for hearing to a special tribunal, or the duty of determining which may be imposed as an additional duty

on a tribunal already in existence. (*Taxpayers v. O'Kelly,* 49 La. Ann. 1039, 22 South. 311; *Williamson v. Lane,* 52 Tex. 335; *Breuggermann v. Young,* 208 Ill. 181, 70 N. E. 292; *Quartier v. Dowiat,* 219 Ill. 326, 76 N. E. 371; 7 Ency. of Pl. & Pr. 376.)

If the statutory remedy is constitutional, and the district court is held to have concurrent jurisdiction, then when the contestant goes to the district court for his remedy, he must go (in the absence of a statute prescribing the method in that particular court) in the manner prescribed by the common law.

This common-law remedy is by *quo warranto,* and it is the only remedy at common law. It is a proceeding brought under well-established forms and by certain authorized persons. (7 Ency. of Pl. & Pr.-377, and cases cited; 10 Am. & Eng. Ency. of Law, 796, 801, and cases cited; *Tarbox v. Sughrue,* 36 Kan. 225, 12 Pac. 935.)

If this act in question is unconstitutional, there is no tribunal having jurisdiction of a contest of a district judge. (*Baird v. Hutchinson,* 179 Ill. 435, 53 N. E. 567; *Douglas v. Hutchinson,* 183 Ill. 323, 35 N. E. 628.)

Elections belong to the political branch of the government, and are beyond the control of the judicial power. The determination of election contests is a judicial function only so far as authorized by statute.

The intent is plain, and in seeking to interpret the meaning of a constitutional provision, the intent of the framers of the instrument should, if possible, be ascertained and carried out. (10 Century Digest, 1223 (6) ; 8 Cyc. 730, 733, 731 C.)

We assert, as a historical fact, and on the authority of a number of the members of that convention, and as a matter that cannot be gainsaid or contradicted, that the only object the constitution makers had, as shown by their utterances and proceedings upon this important question, was the prohibition of polygamous practices and teachings, and it was not the intention to include in the inhibited teachings or practices anything except marriages of a polygamous and plural character.

Where a later act of the legislative body fully embraces the whole subject matter of a former act, it repeals such former act by implication, even if it does not so repeal it in express terms. (*Dugan v. Gitting*, 3 Gill, 138, 43 Am. Dec. 306; *Goddard v. Boston*, 20 Pick. (Mass.) 410.)

AILSHIE, C. J.—This proceeding was instituted on December 15, 1906, in the district court of the fifth judicial district in and for the county of Bannock. It is a proceeding to contest the election of the defendant and respondent as judge of the fifth judicial district of this state. The complainant alleged that he was an elector of the state and of the county of Bannock on November 6, 1906, and that as such elector he prosecutes this proceeding to contest the election of the Honorable Alfred Budge as district judge. He alleges that on November 6, 1906, the defendant was elected judge of the fifth judicial district, and that thereafter and on November 26, 1906, the state board of canvassers canvassed the election returns and declared the defendant duly elected to the office of. district judge in and for the fifth district.

The sole and only grounds of contest alleged by the complainant on account of the existence of which he alleges that the defendant had not been duly and regularly elected to such office, and for which he prayed that the office be declared vacant, are those found in sec. 3, art. 6 of the state constitution. That section is as follows:

"No person is permitted to vote, serve as a-juror, or hold any civil office who is under guardianship, idiotic or insane, or who has at any place been convicted of treason, felony, embezzlement of public funds, bartering or selling or offering to barter or sell his vote, or purchasing or offering to purchase the vote of another, or other infamous crime, and who has not been restored to the rights of citizenship, or who at the time of such election is confined in prison on conviction of a criminal offense, or who is a bigamist or polygamist, or is living in what is known as partriarchal or celestial marriage, or in violation of any law of this state, or of the United States, forbidding any such crime; or who in any manner, teaches,

advises, counsels, aids or encourages any person to enter into bigamy, polygamy, or such patriarchal, plural or celestial marriage, or to live in violation of any such law, or to commit any such crime; or who is a member of, or contributes to the support, aid, or encouragement of, any order, organization, association, corporation, or society, which teaches, advises, counsels, encourages or aids any person to enter into bigamy, polygamy or such patriarchal or plural marriage, or which teaches or advises that the laws of this state prescribing rules of civil conduct, are not the supreme law of the state; nor shall Chinese or persons of Mongolian descent not born in the United States, nor Indians not taxed, who have not severed their tribal relations and adopted the habits of civilization, either vote or serve as jurors, or hold any civil office.''

It is alleged that the defendant judge is one of the persons named in the foregoing provision of the constitution as prohibited from holding any civil office within this state. The principal grounds charged as constituting the inhibition against this defendant, are: That the defendant was on November 6, 1906, and for a long time prior thereto, and ever since said date has been, a member of an organization known as the Church of Jesus Christ of Latter-Day Saints, commonly called the Mormon Church, and that he did at all the times mentioned, and still does, contribute to the support, aid and encouragement of such organization and church; "that said church teaches, advises, counsels, encourages and aids persons to enter into polygamous marriages,'' and ''plural marriages'' and ''patriarchal marriages,'' and ''celestial marriages.''

The complaint, consisting of thirty-three paragraphs, charges the organization, commonly known as the Mormon Church, with teaching each and every of the separate acts inhibited by sec. 3, art. 6 of the constitution, and charges the defendant with being a member thereof, and contributing to the support and aid of the organization. It does not, however, charge the defendant himself with bigamy or polygamy, unless charging celestial and patriarchal marriage amounts to charging bigamy and polygamy. It does charge him, though, with ''living in what is known as celestial marriage,''

and with "teaching, advising, counseling and encouraging persons to enter into what is known as celestial marriage." The complaint prays for a judgment decreeing that the defendant was at the time of his election ineligible to hold the office of district judge, and that the office be declared vacant.

The defendant demurred to the complaint, 1st, on the ground that the court in which the complaint was filed had no jurisdiction of the subject matter; 2d, that the complaint did not state facts sufficient to constitute a cause of action; 3d, that it was uncertain and ambiguous in that it did not allege what complainant meant by charging that the defendant was living "in what is known as celestial marriage," and also in charging that defendant was living "in what is known as patriarchal marriage." The demurrer came on for hearing before the Honorable James M. Stevens, judge of the sixth judicial district, presiding, and after argument was sustained, and the complainant declining to amend, the cause was dismissed. This appeal is from the judgment.

The first question presented on this appeal is as to the jurisdiction of the district court to hear and determine a contest of election of a district judge. Respondent contends that the only authority to be found in the laws of this state for contesting the election of a district judge is that contained in the act of February 2, 1899 (Sess. Laws, 1899, p. 33), and that by sec. 124 thereof the supreme court is vested with original jurisdiction in such cases. That section provides as follows:

"The supreme court shall hear and determine contests of the election of judges of the supreme court, judges of the district courts, and district attorneys; and in case they shall disagree, the governor shall act with them in determining, but no judge of the supreme court shall sit upon the hearing of any case in which he is a party."

The appellant, on the contrary, contends that in the first place the foregoing section is unconstitutional; in the second place, that if it is constitutional, it is only a concurrent jurisdiction with the district courts; that under the provisions of sec. 20, art. 5 of the constitution, "the district courts have original jurisdiction in all cases both at law and in equity,"

and that it would consequently be beyond the power of the legislature to deprive that court of its original jurisdiction in an election contest. In the light of these different contentions, we turn our attention to an examination of the legislative enactments on the subject, and also of the constitutional provisions applicable to the controversy.

At the time of the adoption of the constitution, we had on the statute-books of the then territory, secs. 5026 to 5042, Rev. Stat., providing for contesting certain elections. At the time of the adoption of the constitution, an election contest was designated by the statute as a "special proceeding of a civil nature" and was made a title of part 3 of the Code of Civil Procedure. Under the provisions of the statute as it then existed, the district courts were given jurisdiction in such cases as the one at bar. After the adoption of the constitution, the first legislature enacted an election law of which the act of February 2, 1899 (Sess. Laws 1899, p. 33), is a reenactment. By sec. 162 of the latter act, it is provided that "All acts and parts of acts enacted by any territorial legislature relating to elections be and the same are hereby repealed." That act contained a complete election law, as well as specific enactments for contesting each and every office to which a candidate might be elected. It also provided the board, body or forum in which each contest should take place. The act of February 2, 1899 (Sess. Laws 1899, p. 33), was clearly intended to provide a full and complete scheme and procedure for holding elections and the contests thereof, and repealed all territorial election laws and with it such territorial statutes as provided for the contesting of elections. A statute providing for contesting an election is clearly legislation "relating to elections," and was within the repealing provisions of sec. 162 of the act. We conclude that the only legislation we now have in this state that refers to the contest of elections is that found in the legislative enactments subsequent to the adoption of the constitution. This determination leads to the conclusion that if sec. 124 of the act of February 2, 1899, is constitutional, then the supreme court has original jurisdiction over such a contest. It remains, then,

to determine whether or not the foregoing section is constitutional, and if constitutional, whether the jurisdiction there conferred is exclusive or is merely concurrent with the district courts. These two questions are so intimately related that the consideration of the one will necessarily involve the other, and we will therefore consider them both together.

It seems to be conceded by the authorities that at common law there was no such a proceeding or remedy as an election contest, and that the only way known to the common law to contest the right of a person to an office was by the writ of *quo warranto,* and that remedy was invoked in the name of the crown by the public prosecutor, or, as we term him, the attorney general. (*Carter v. Superior Court,* 138 Cal. 150, 70 Pac. 1067; *Budd v. Holden,* 28 Cal. 124; *Snowball v. People,* 147 Ill. 260, 35 N. E. 538; Paine on Elections, sec. 793, 794; 7 Ency. Pl. & Pr. 377; 15 Cyc. 393.) The territorial legislature at the session of 1887, enacted secs. 4612 to 4619, inclusive, which are practically a codification of the common-law *quo warranto,* with some additions and enlargement both as to subject matter and authority and jurisdiction of the courts. Those provisions of the statute are still in force. They at once became a part of the power and jurisdiction of the district courts, as was *quo warranto* at common law, and they remain such to this day. The present proceeding is not prosecuted under the provisions of the foregoing sections, and was evidently not instituted on that theory. It was brought purely as an election contest and in the name of an elector as contestant. Of this, however, we will deal later. For the purposes of our present consideration we treat the proceeding as a straight election contest. The question then arises: Is an election contest a *case* either at *law* or in *equity* within the meaning of sec. 20, art. 5 of the constitution? That section reads: "The district court shall have original jurisdiction in all cases both at law and in equity, and such appellate jurisdiction as may be conferred by law." At first blush, it would seem that the framers of the constitution had by the words "in all cases both at law and in equity" intended to cover all matters, subjects and controversies involv-

ing judicial determination or requiring a judicial investigation for their determination. A reading, however, of sec. 21 of the same article, which confers original jurisdiction "in all matters of probate, settlement of estates of deceased persons and appointment of guardians," on probate courts, discloses at once that it was not the intention of the framers of the constitution to cover the whole field of litigation or judicial inquiry or investigation by the words "at law and in equity." Indeed, this court so held in *In re Estate of McVay, ante,* p. 56, 93 Pac. 28. It would seem, however, that aside from the jurisdiction conferred by sec. 21, it must have been the intention of the framers of the constitution in drafting sec. 20 to cover all other subjects of judicial investigation, inquiry and determination that might arise under the constitution or laws of the state. In considering the same language used in the federal constitution, the supreme court of the United States, in *Mayor of Nashville v. Cooper,* 6 Wall. 247, 18 L. ed. 851, said: "The power here under consideration is given in general terms. No limitation is imposed. The broadest language is used. 'All cases' so arising are embraced. None are excluded. How jurisdiction shall be acquired by the inferior courts, whether it shall be original or appellate, or original in part and appellate in part, and the manner of procedure in its exercise after it has been acquired, are not prescribed. The constitution is silent upon those subjects. They are remitted without check or limitation to the wisdom of the legislature. . . . . A case in law or equity consists of the right of the one party as well as the other, and may be truly said to arise under the constitution or a law of the United States whenever its correct decision depends upon the right construction of either."

Aside, however, from these considerations and legal conclusions, the inquiry still remains: Is an election contest necessarily or innately a *judicial* inquiry? It must be conceded, we think, that a contest, as distinguished from a *quo warranto* or inquiry on information, is of purely statutory origin. (Paine on Elections, sec. 793.) In the absence of legislation providing for and authorizing an election contest, no such

right would exist, and consequently there would be no remedy therefor cognizable in either a court of law or equity.

In *Douglas v. Hutchinson*, 183 Ill. 323, 55 N. E. 628, the supreme court of Illinois in 1899, in considering this identical question under the constitution of that state, said: "The provision of the constitution conferring original jurisdiction upon circuit courts includes the prosecution of every claim or demand in a court of justice which was known, at the adoption of the constitution, as an action at law or a suit in chancery. It also includes all actions, since provided for, in which personal or private rights are involved, which belong to the same class, or are of the same nature, as previously existing actions at law or in equity. Such are cases where the legislature creates a new statutory remedy for the recovery of property, or for damages occasioned by the infringement of a right. There are many special statutory proceedings which involve rights, but which are not within the terms of the constitution, because they are not causes at law or in equity. This proceeding has never been regarded, under common law or equity practice, as a cause at law or in equity, and is not of the same nature as such a cause." In 1905 that case was affirmed in *Quartier v. Dowiat*, 219 Ill. 326, 76 N. E. 371.

In *Williamson v. Lane*, 52 Tex. 335, the supreme court of Texas held that "The determination of the result of an election is not a matter pertaining to the ordinary jurisdiction of the law in courts of justice. It is in the nature of a political question, to be regulated, under the constitution, by the political authority of the state." It has also been held by very respectable authority that the holding and conducting of elections is exclusively under the control, direction and management of the political power of the state, and that the manner of conducting them and questions arising in declaring the results thereof, and the determination as to who has been duly elected to office, are all within the control of the political power of the state, and are entirely separate and independent from and outside of those powers known as the *judicial* power and authority of the state. This principle was

announced in *Dickey v. Reed,* 78 Ill. 261, wherein the court said: "Elections belong to the political branch of the government, and are beyond the control of the judicial power. It was not designed, when the fundamental law of the state was framed, that either department of government should interfere with or control the other; and it is for the political power of the state, within the limits of the constitution, to provide the manner in which elections shall be held, and the manner in which officers thus elected shall be qualified and their elections contested." The foregoing was approved and reaffirmed in *Douglas v. Hutchinson, supra.*

McCrary on Elections seems to recognize the fact that the matters involved in an election contest are not necessarily judicial in character. In other words, that they are at most merely *quasi judicial,* as he recognizes the power of the legislature to deprive the courts entirely of jurisdiction in such matters, or rather withhold jurisdiction from them. At sec. 344, he says: "Where the statute creates a board for the purpose of determining election contests and confers upon such board exclusive jurisdiction, in such cases the courts are deprived of jurisdiction to pass upon the results of any such contests." Such a conclusion could not be arrived at if the determination of those controversies were recognized as of purely a judicial character and inherently belonging to the courts. The same principle has been recognized in a great number of authorities. (*Hipp v. Supervisors,* 62 Mich. 456, 29 N. W. 77; *Moulton v. Reid,* 54 Ala. 320; *Parmeter v. Bourne,* 8 Wash. 45, 35 Pac. 587; *Clarke v. Rogers,* 81 Ky. 43; *State v. Judge Second Judicial District,* 35 La. Ann. 89; *State v. Police Jury,* 41 La. Ann. 850, 6 South. 777; *Skrine v. Jackson,* 73 Ga. 377; *Reynolds v. Police Jury,* 44 La. Ann. 863, 11 South. 236; 15 Cyc. 394; *Caldwell v. Barrett,* 73 Ga. 604.) We conclude that the right of an elector to contest an election is of purely statutory origin, and that the determination of a contest is not of itself necessarily of such a judicial character as to inherently fall to the courts upon its creation, and that the legislative authority which grants the right may also designate or establish a board, body or tribunal

that shall hear and pass upon that right. At the time of the adoption of the constitution, it was not recognized in this territory as a common-law right; neither was it recognized by the territorial statutes as a right or remedy either "at law or in equity." On the contrary, by the territorial statutes it was designated as a "special proceeding," the jurisdiction of which was conferred upon the district courts by special legislative enactment. We conclude, therefore, that the framers of the constitution in the adoption of sec. 20, art. 5, *supra,* did not by that provision necessarily include election contests within the jurisdiction of "cases at law and in equity." If such remedy was contemplated by that provision of the constitution, the right of election contests would have been inherited to every elector in the state upon the adoption of the constitution, irrespective of legislation on the subject. That assumption would not be warranted. In this view of the constitution and the statutes, it necessarily follows that sec. 124 of the act of February 2, 1899, is constitutional and valid. If election contests are purely within the legislative control and discretion and belong to the political power of the state, then the legislature may confer the jurisdiction to hear and pass upon such contests upon any court it sees fit, or upon a board or body specially created for the purpose or withhold the right entirely.

Incidental to this question arises another contention made by appellant to this effect: That under sec. 119 of the act of February 2, 1899 (Sess. Laws 1899, p. 60), "The election of any person to any public office . . . . may be contested. . . . . 2. When the incumbent was not eligible to the office at the time of the election," and that he is therefore only pursuing the remedy there prescribed in raising the ineligibility of respondent to hold the office to which he was elected. Now, it must be conceded, we think, that we have on the statute books two remedies for reaching the ineligibility of a person to hold office; one by contest under the provisions of the foregoing act; the other by information in the nature of *quo warranto* under secs. 4612 to 4619, Rev. Stat.

Proceeding under information, the jurisdiction is clearly in the district courts. Proceeding under the statute for contests, the jurisdiction to contest the election of a district judge is clearly in the supreme court. Under the contest law, no one may be a contestant or plaintiff who is not at the time an elector of the state, county or district in which the officer was elected. On the other hand, proceeding under information, the action must be prosecuted in the name of the people, and on relation of the attorney general or county attorney, as the case may be. These statutes authorizing proceedings against usurpers and intruders into office are in the interest of and for the protection of the people at large, and no person, except one who is himself entitled to the office, is supposed to have any more interest in such a proceeding than any other citizen. The remedy is therefore only available to the people, except in the one single instance under sec. 4612, where a person originally entitled to the office may bring an action in his own name against a usurper. Another distinction to be noted between these two provisions is that a contest is directed toward facts and conditions that exist at the time of the election of the incumbent or that transpired at the election itself. On the other hand, the statutes providing for information against usurpers and intruders into office have reference to conditions that exist at the time the action is brought. A person might be eligible to hold an office at the time he was elected, and therefore not be subject to a contest on the ground of ineligibility. Subsequent to his election, he might become one of the inhibited class enumerated in sec. 3, art. 6 of the constitution, and would immediately become ineligible to continue to hold the office and consequently liable to a proceeding under secs. 4612 to 4619 for unlawfully holding the position. Under sec. 23, art. 5 of the constitution, no one is eligible to the office of district judge who is not "at the time of his election an elector in the judicial district for which he is elected." Now, if at the time of his election he falls within the inhibition of sec. 3, art. 6, he is not an elector, and is therefore ineligible to hold the office of district judge. It will therefore be seen that the

legislature of this state in providing the grounds upon which an election contest may be had, has, in effect, authorized an inquiry upon contests into the question as to whether or not the incumbent was an elector at the time of the election within the contemplation of sec. 3, art. 6. Counsel for appellant argues with great earnestness and much force that it is without and beyond the power of the legislature to take from the duly organized, constitutional, judicial tribunal, the power and jurisdiction of determining a constitutional question; in other words, of determining a constitutional eligibility or ineligibility to hold an office. We would hesitate very much before disagreeing with counsel as to that proposition. Primarily, an election contest signifies a controversy between two contending candidates for the same office. The unsuccessful candidate is contesting against the candidate to whom the election board have issued a certificate. It is an adversary proceeding. (*Burke v. Perry*, 26 Neb. 420, 42 N. W. 401; *State v. Francis*, 88 Mo. 561.) There can be no constitutional question or right involved as to the citizen himself as distinguished from the commonwealth in the mere holding of an election, counting the votes, making returns and declaring the result. But in this state the legislature has seen fit to go further than is ordinarily contemplated by the expression "election contest," and has authorized the court or board hearing the contest to inquire into the eligibility of the incumbent in the event the contestant charges that as one of the grounds of his contest. We can see no legal or valid objection to the legislature granting the right to a contestant to have the question of the eligibility of the candidate inquired into upon a contest, when we keep in mind the fact that there is guaranteed to the people and likewise to the candidate elected, as well as the one claiming the office, the right to have the eligibility of the incumbent judicially determined in the properly constituted courts under information as provided in secs. 4612 to 4619. As to the finality or conclusiveness of the determination of a *constitutional ineligibility* to hold office on a contest proceeding, we express no opinion. A somewhat kindred question arose in Kentucky in the case of *Common-*

*wealth v. Jones,* 10 Bush (Ky.), 725. The court in that case had under consideration the question of a legal disqualification to hold an office and the power of a contesting board to finally determine such question. The court said: "To admit that a contesting board may determine finally as to what constitutes a legal disqualification for office would be to decide that the legislature, instead of confining these tribunals to the discharge of executive duties, and to the determination primarily of mere questions of fact, had, in disregard of the distribution of the powers of government, existing by virtue of the first article of the constitution, created a high judicial tribunal—a court with power and authority to determine finally and conclusively questions of individual rights arising under the constitution—and provided that it should be composed exclusively of high executive officers.

"It is a matter of great difficulty to draw the exact line of demarcation between executive and judicial powers, and of still more difficulty to define with accuracy how far executive officers, in the discharge of executive or ministerial duties, may bind the other departments of government by the exercise of *quasi-judicial* functions. But we regard it as an indisputable proposition that where the inquiry to be made involves questions of law as well as fact, where it affects a legal right, and where the decision may result in terminating or destroying that right, the powers to be exercised and the duties to be discharged are essentially judicial, and are such as cannot constitutionally be delegated to or imposed upon executive officers." That court concluded by holding that an ascertainment and determination of the legal disqualification of a person to hold office "is essentially judicial," and that while the board might, in the first instance, pass upon it, that it would still be open to the courts for final consideration in case it became necessary to resort to the courts in order to carry out the order, determination or decision of the election board. (Dillon's Munic. Corp., 4th ed., sec. 201.) As touching the principle involved see, also, *Cummings v. State of Missouri,* 4 Wall. 277, 18 L. ed. 356; *In re Garland,* 4 Wall. 333, 18 L. ed. 366.

Counsel for appellant argued that since the complaint in this proceeding presents all the facts necessary to be pleaded in an action in the nature of *quo warranto* under secs. 4612 to 4619, that he is entitled to maintain the proceeding, although it was not brought in the name of the state or by the attorney general. Counsel's argument appears reasonable and sound, but is successfully met by the statute itself. Sec. 4612, Rev. Stat., provides as follows: "An action may be brought in the name of the people of the state against any person who usurps, intrudes into, holds or exercises any office or franchise, real or pretended, within this state, without authority of law. Such action shall be brought by the district attorney of the proper county, when the office or franchise relates to a county, precinct, or city, and when such office or franchise relates to the state, by the attorney general; and it shall be the duty of the proper officer, upon proper showing, to bring such action whenever he has reason to believe that any such office or franchise has been usurped, intruded into, held or exercised without authority of law. Any person rightfully entitled to an office or franchise may bring an action in his own name against the person who has usurped, intruded into, or who holds or exercises the same." It will be noticed that the action must be brought in the name of the people of the state against the person who is usurping, intruding into or holding the office without authority of law, and must be prosecuted either by the district attorney or attorney general, as the case may be. The last sentence of the foregoing section provides the only instance in which the action may be prosecuted in the name of an elector, and that is a case where the person claiming to be rightfully entitled to the office himself may bring the action in his own name against the intruder or usurper. The latter provision was evidently added to the section for the purpose of enabling one who was appointed to an office, or for any cause was not in position to contest the election, to maintain his action directly against the person who is unlawfully holding the office and exercising the functions thereof. In the present case, the action is not prosecuted in the name of or on behalf of

the people of the state, nor is it prosecuted by any person claiming himself to be entitled to the office, nor does he make any showing that he has at any time applied to or requested the attorney general to bring the action against respondent, nor does he show any refusal on the part of the district attorney or attorney general to take the necessary action, nor has he ever applied to the court for leave to prosecute the action on behalf of the people. He has therefore failed to bring himself within the purview of the statute. It is true that in certain cases where the public prosecutor or attorney general refused to bring the action on proper application being made to him, an elector or private party has been granted leave in the discretion of the court to maintain the action as relator on behalf of the people. Such an application, however, is addressed to the sound discretion of the court. Such permission was clearly never applied for or obtained in this case. In considering the right of a private relator to maintain an action in the nature of *quo warranto,* such as is authorized by sec. 4612 of our statute, High on Extraordinary Legal Remedies, 2d ed., p. 472, says: "The principle is now firmly established, that the granting or withholding leave to file an information, at the instance of a private relator, to test the right to an office or franchise, rests in the sound discretion of the court to which the application is made, even though there is a substantial defect in the title by which the office or franchise is held. In the exercise of this discretion, upon the application of a private relator, it is proper for the court to take into consideration the necessity and policy of allowing the proceeding, as well as the position and motives of the relator in proposing it, since this extraordinary remedy will not be allowed merely to gratify a relator who has no interest in the subject of inquiry. The court will also weigh the considerations of public convenience involved, and will compare them with the injury complained of, in determining whether to grant or refuse the application." (Paine on Elections, secs. 877-880.) For an exhaustive consideration of the authority and control of the attorney general over proceedings in *quo warranto,* see *State v. Gleason,* 12 Fla. 210. The

soundness of the principles above announced is clearly apparent upon a moment's reflection. To allow any and every citizen to commence an action against any public official to oust him from office at any time he may see fit, whether for private and personal revenge or the public weal, would be most disastrous, dangerous and prejudicial to the public service. In some communities and under certain conditions, they might keep a public officer engaged most of the time defending his right to the office instead of discharging the public business. This remedy was created for the benefit and protection of the public in its governmental and sovereign capacity, and for the benefit of the community at large, rather than for the gratification, satisfaction or protection of any particular individual other than one himself entitled to the office. The law-making power, in recognizing the right and prescribing the remedy to inquire into the conditions and circumstances under which one claims to hold an office, had the clear and unquestionable authority to also designate the party or parties who might invoke this remedy and the conditions under which it might be applied. It might be argued in reply to this position that the legislature saw fit to allow any elector to contest the election of an officer, and that such right or privilege on the part of every elector has not proven disastrous or detrimental to the public good. The answer to that, however, is that a contest must be instituted within twenty days after the canvass of the election returns. While the privilege is extended to all electors, the time within which it must be exercised is limited to a very short period, and that period has generally expired before the case of any contestant has been heard, so that ordinarily only one contest is filed against any candidate. On the other hand, the right to proceed by information is open throughout an official's entire term of office.

In the light of the foregoing investigation and determination, we conclude that the proceeding, being an election contest, was brought in a court that had no jurisdiction of the subject and that the demurrer was properly sustained. We are also of the opinion that it could not be properly recog-

nized or maintained as an information under sec. 4612, Rev. Stat., for the reasons hereinbefore stated.

We have been urged by the eminent and distinguished counsel on both sides in this controversy that whatever view we may take of the jurisdictional question just considered, we also pass upon and define the terms "celestial" and "patriarchal" marriage as they are used in the above-quoted section of the constitution. We appreciate the fact that this case might be determined and disposed of by us on the jurisdictional question alone. On the other hand, the demurrer raised the sufficiency of the complaint, and particularly in respect to its charging defendant with celestial and patriarchal marriage, and the demurrer was sustained generally by the trial court without specifying upon which ground. Both the jurisdictional question and the sufficiency of the complaint have been fully and exhaustively argued, both orally and by briefs, and the questions are directly raised and have been fully presented to the court. Under that condition of the proceeding, we are inclined to the belief that we should pass upon this latter question and that our decision thereon would be a judicial expression as distinguished from *obiter dictum* (*Buckner v. Chicago M. & N. W. Ry. Co.*, 60 Wis. 264, 19 N. W. 56; *Florida Cent. Ry. Co. v. Schutte*, 103 U. S. 118, 6 L. ed. 327; *Kane v. McCown*, 55 Mo. 181), and would be binding upon the court in any future litigation involving the construction of these terms as employed in the constitution. In view of these considerations, and of the high attainments and professional standing of the respective attorneys in this case, and their request and stipulation made in open court for a decision on this branch of the case, and in the light of the further contention made by them that the question involved is of such general public importance that the views of the court of last resort ought to be speedily given thereon, the court has consequently examined the matter with more than usual care and diligence, and we briefly express the conclusion reached by our research and investigation.

In the first place, it is urged by appellant and admitted by respondent that sec. 3, art. 6 of the constitution is self-

operative, and self-acting and needs no legislation to carry its provisions into effect. Indeed, this court has on several occasions held other and similar negative and prohibitory provisions of the constitution as self-executing. (*Katz v. Herrick*, 12 Ida. 1, 86 Pac. 873; *Day v. Day*, 12 Ida. 556, 86 Pac. 531; *Cunningham v. Moody*, 3 Ida. 125, 28 Pac. 395.)

It requires no argument nor citation of authority to establish the proposition as a well-founded legal conclusion that no one can exercise the elective franchise, serve on a jury or hold office who comes within the inhibition of sec. 3 of the "Suffrage and Elections" article of the constitution. In such case the only inquiry to be made is: Does the defendant come within the constitutional enumeration of prohibited persons or classes as charged in the complaint?

On February 3, 1885, the territorial legislature passed an act regulating elections within the territory and prescribing the qualifications of electors, and sec. 16 of the act contained what has been popularly known ever since as the "Test Oath" (Sess. Laws, 1885, p. 110). At that time it was generally conceded, we believe, even by the Mormon authorities and ecclesiastics themselves, that bigamy, polygamy, and plural and celestial marriage was a tenet of the Church of Jesus Christ of Latter-Day Saints, and was taught by it and practiced by some of its members. In support of this assumption, see Extracts from Church History and Church Doctrines, quoted in *Hilton v. Roylance*, 25 Utah, 129, 91 Am. St. Rep. 821, 69 Pac. 660, 58 L. R. A. 723. See, also, *Davis v. Beason*, 133 U. S. 333, 10 Sup. Ct. 299, 33 L. ed. 637; *Reynolds v. United States*, 98 U. S. 145, 25 L. ed. 244; *Late Corporation of Latter-Day Saints v. United States*, 136 U. S. 1, 10 Sup. Ct. 792, 34 L. ed. 481. It was at that time a burning issue in this territory as to whether anyone who taught such a doctrine or creed or practiced the principles thus taught should be allowed the elective franchise or to hold any office of profit or trust. The test oath provision was incorporated into sec. 504 of the Revised Statutes of 1887, and its substance was also embodied into sec. 501 of the same code. In 1889 the case of *Davis v. Beason* was taken to the supreme court of the

United States, where it was argued in December of that year. In that case it was contended that the statute of Idaho was in contravention of the first amendment of the constitution of the United States, and was an unlawful and unwarranted interference with religious toleration. The supreme court denied that contention and sustained the acts of the territorial legislature, and that decision would equally apply at this time to the validity of the constitutional provision now under consideration. Sec. 3, art. 6 of the constitution prescribes substantially the same qualifications for electors as was required by the foregoing territorial statutes. We must now determine the meaning of the language used in this section in the light of conditions as they existed at the time the constitutional convention was in session in July, 1889. As said by the supreme court of the United States in *Maxwell v. Dow,* 176 U. S. 601, 20 Sup. Ct. 456, 44 L. ed. 605: ''The safe way is to read its language in connection with the known condition of affairs out of which the occasion for its adoption may have arisen, and then to construe it, if there be therein any doubtful expressions, in a way, so far as is reasonably possible, to forward the known purpose or object for which the amendment (constitutional) was adopted.'' (See 8 Cyc. 730, and cases cited.)

It would be useless to go to dictionaries and lexicons for definitions of such words and terms as ''celestial marriage'' and ''patriarchal marriage'' as here used in the organic law of the state. We are now removed nearly nineteen years from the time about which we must inquire as to the social, civil and political conditions that confronted the constitutional convention and the people of this territory, and for that information we must turn to the public history of the day as it can be gathered from the press, public writings and current literature of that time, aided by whatever memory we may have left as to the occurrences of those days. The principal and primary object of the people and their representatives in the constitutional convention was to suppress and forever outlaw and discountenance bigamy and polygamy within the state of Idaho, under whatever name or designation it might

be given or under whatever doctrine or creed it might be recognized, taught or practiced by any person or organization. So when the convention came to writing sec. 3 of the article on "Suffrage and Elections," they were confronted by the fact that while in the language of legislatures, courts and law-writers, anything which looked like having more than one wife at one and the same time was defined as *bigamy* or *polygamy*, nevertheless, this organization of Latter-Day Saints, commonly called the Mormons, was employing and using other terms and expressions concerning the marital relation, and which terms might also signify bigamy and polygamy; so the convention included those other terms also in sec. 3 as herein set out. No more importance seems to have been attached by the convention to the words "celestial" and "patriarchal" than to the words bigamy and polygamy, and, indeed, we have been unable to learn where any member of the convention ever offered to define either of those terms as meaning anything other than bigamy or polygamy—no stress seems to have been laid upon them. So far as we are able to ascertain, sec. 3 appears to have been adopted by the convention without debate, and whatever discussion or debate took place in the convention on this subject must have occurred over the adoption of sec. 4 of art. 6, or concerning the Declaration of Rights, or both. The consensus of opinion seems to have been that the convention would strike down bigamy and polygamy, and that since the Mormon Church taught those practices, the incidental result would be to strike at that organization and deprive its members and adherents of the elective franchise. The convention seems to have thought that since the church taught a specific and peculiar doctrine with reference to "celestial and patriarchal marriage" that in the event of a prosecution they might disclaim the doctrine of bigamy and polygamy and yet justify substantially the same teaching and practices under the church names of "celestial" and "patriarchal." In this connection it is interesting and important to know just what the Church of Latter-Day Saints taught and believed in 1889 and prior thereto with reference to the marital relation and par-

ticularly as to "celestial and patriarchal marriage." For this latter purpose we have consulted the opinion in *Hilton v. Roylance* very freely, for the reason that it gives more information and references on this specific subject than anything else we have found. We presume the supreme court of Utah from which that opinion comes is and has been in a better position to know the tenets and doctrines of the Mormon Church and the meaning of these terms as then used by that organization than any other court or judicial body in the land. Turning to this phase of the inquiry, we find that President Wilfard Woodruff of the Mormon Church is reported as having said in the course of a speech delivered in 1883, in discussing the marriage relation: "So I will say to our friends here—the strangers within our gates—that any man that marries a wife by any authority other than the authority of the holy priesthood is simply married for time, 'or until death do you part.' When you go into the spirit world you have no claim on your wife and children. The ordinance of having them sealed to you by one having authority of the holy priesthood must be attended to in this world. Father Abraham obeyed the law of the patriarchal order of marriage. His wives were sealed to him for time and all eternity, and so were the wives of all the patriarchs and prophets that obeyed the law." (*Hilton v. Roylance*, 25 Utah, 153, 69 Pac. 668.)

Prior to the foregoing utterances by President Woodruff, Orson Pratt, an elder of the church, who appears to have attained a high standing as an expounder of the church doctrine, said: "It seems, then, that if we wish to fulfill the object of our creation and if we are truly in the Lord, we must go into the eternal world as married, not for time, not by some justice of the peace that is an infidel, not by a man that has no right to join us together under the revelation and authority of the Most High, but we must be married for eternity by a man who has the right to speak, being commanded of the Lord, holding the keys of authority and power, who can say to the man and woman, 'I pronounce you husband and wife for time and all eternity.' Then you will be

married according to the pattern given. Then you will have a claim upon each other after death. But have married people in the nations a claim upon each other after death? I mean those who have not been married after the pattern and authority of heaven. By no means. Their contracts are made only for a little space—some twenty, thirty, fifty or seventy years, as the case may be. Then death comes along and the contract runs out; and when you come in the resurrection, who are you? Have you any wife there? Oh, no. Why not? Because you were not sealed or married to each other by Divine authority. That is the reason. . . . . The word of the Lord told you to gather up here. What for? That you might, among other things, be married according to the law of God. I am endeavoring to tell you some of our peculiarities. We do believe that every man who gathers up with the saints, whether married by the gentile law or not, should be married by one holding Divine authority to officiate, and thus have the ordinance, the ministration, sealed on earth, that it may be sealed in the heavens." (*Hilton v. Roylance*, 25 Utah, 153, 69 Pac. 668.)

In the "Articles of Faith," page 457, written by Dr. James E. Talmage, acting under appointment and by authority of the church, the author wrote: "Marriage, as regarded by the Latter-Day Saints, is ordained of God, and designed to be an eternal relationship of the sexes. With this people it is not merely a temporal contract to be of effect on earth- during the mortal existence of the parties, but a solemn agreement which is to extend beyond the grave. In the complete ceremony of marriage, as prescribed by the church, the man and the woman are placed under covenant of mutual fidelity—not 'until death do you part,' but 'for time and for all eternity.' A contract as far-reaching as this, extending not only throughout time, but into the domain of the hereafter, requires for its validation an authority superior to that of earth; and such an authority is found in the holy priesthood, which, given of God, is eternal."

In the "Key to Theology," by Parley P. Pratt, as reported in *Hilton v. Roylance*, with reference to the binding

effect and continuance of the marital relation, it is stated as follows: "All vows, covenants, contracts, marriages, or unions not formed by revelation and sealed for time and all eternity, and recorded in the holy archives of earth and heaven by the ministration of the holy and eternal priesthood, will be dissolved by death, and will not be recognized by the eternal authority after the parties have entered through the veil into the eternal world. This is Heaven's eternal law, as revealed to the ancients of all ages, who held the keys of eternal priesthood, after the order of the Son of God, and as restored with the priesthood of the saints of this age."

President Brigham Young of the Mormon Church is reported, in *Hilton v. Roylance,* to have stated in a public discourse as late as May 8, 1870, as follows: "I will say a few words on a subject which has been mentioned here; that is celestial marriage. God has given a revelation to seal for time and for eternity, just as he did in the days of old. In our own days he has commanded his people to receive the new and everlasting covenant, and he has said, 'If ye abide not that covenant, then are ye damned.' We have received it." And to similar effect is the discussion of President Taylor of the church in speaking on the subject of celestial marriage, wherein he said: "God has revealed through his servant, Joseph Smith, something more. . . . . He has revealed unto us the law of celestial marriage, associated with which is the principle of plural marriage."

In the Hilton-Roylance case, in considering and discussing when a celestial marriage begins and ends, the court says: "In 1 Whitney, Hist. Utah, p. 212, speaking of the doctrine of celestial marriage, the author said: 'It was to the Latter-Day Saints the key to the celestial kingdom, where, according to their faith, family relationships formed on earth according to Divine law will be perpetuated. Hence, the revelation enjoining celestial marriage was entitled, "Revelation on the Eternity of the Marriage Covenant, including plurality of wives." How can "family relationships" be formed on earth, and "perpetuated" in the celestial kingdom, if they are not to begin until both parties are dead? Evidently, the historian

meant that a marriage by authority of the church was for both time and eternity. The revelation referred to relates to the eternity of the "marriage covenant," and doubtless refers to all marriages solemnized by authority of the church, whether monogamous or plural.' "

From the foregoing it seems clear that the church looked upon and regarded marriages celebrated and solemnized by mere civil authority and with only the sanction of law as marriages for "time only," while a marriage solemnized by a duly constituted church authority, or, as they put it, "by the holy and eternal priesthood of the saints," was termed and designated by them as a "celestial" or "patriarchal" marriage, binding not only during this life, but throughout the life to come.

It will also be seen at once from these quotations and citations, that at the time of the constitutional convention the church recognized the two kinds of marriage—one for *time* only, or, in other words, for this life only; and the other for both *time and eternity*, or for this life and the life hereafter. The latter were termed "celestial" or "patriarchal" marriages. Now, it was evidently the intention of the convention to prohibit more than one celestial or "time and eternity" marriage, as well as to prohibit more than one terrestrial or "time only" marriage. But the prohibition on the celestial or patriarchal marriage was only intended to extend to the same period of time and to the same extent as the prohibition on the time marriage—namely, to this life. Constitutions and statutes are drafted and adopted for the government of men and the regulation of their conduct in a civil and temporal government of human beings in this life. Constitutions and statutes care nothing about what men believe with reference to a future existence; indeed, they are intended in this American Union to protect a man in believing anything he wants to believe with reference to the future. They do not deal with *beliefs* but with *acts* and *practices*. They protect any man in believing anything he wants to believe with reference to the future, but they prohibit him from acting or practicing anything in any manner contrary to good

morals or the public weal as prescribed by the laws of the land.

As said by Chief Justice Waite in *Reynolds v. United States,* 98 U. S. 145, 25 L. ed. 244: "Laws are made for the government of actions, and while they cannot interfere with mere religious belief and opinions, they may with practices."

This conclusion is clearly borne out and supported by the provisions of sec. 4 of art. 1 of the constitution, known as the "Declaration of Rights." There the framers of the constitution specifically recognized the right of everyone to the "enjoyment of religious faith and worship," and asserted that no one should ever "be denied any civil or political right, privilege or capacity on account of his religious opinions." It also provided that "liberty of conscience" should not be construed to either justify or "excuse acts of licentiousness or justify polygamous or other pernicious practices, . . . . nor to permit any person, organization or association to directly or indirectly aid or abet, counsel or advise any person to commit the crime of bigamy or polygamy, or any other crime." The section referred to is as follows:

"Sec. 4. The exercise and enjoyment of religious faith and worship shall forever be guaranteed; and no person shall be denied any civil or political right, privilege or capacity on account of his religious opinions; but the liberty of conscience hereby secured shall not be construed to dispense with oaths or affirmations, or excuse acts of licentiousness or justify polygamous or other pernicious practices, inconsistent with morality or the peace or safety of the state; nor to permit any person, organization or association to directly or indirectly aid or abet, counsel or advise, any person to commit the crime of bigamy or polygamy, or any other crime. No person shall be required to attend or support any ministry or place of worship, religious sect or denomination, or pay tithes against his consent; nor shall any preference be given by law to any religious denomination or mode of worship. Bigamy and polygamy are forever prohibited in the state, and the legislature shall provide by law for the punishment of such crimes."

Now, celestial and patriarchal marriages to be participated in in the next world, or a future life, cannot be crimes here and in this life under a civil and man-made government, but whenever they are practiced in this present life to the extent of more than one at a time, they become bigamous or polygamous, and are prohibited by the organic law of the state. It therefore clearly appears that the convention itself was guarding against *acts* and *practices* and *teachings* and not against *beliefs*. There was no objection at that time, and can be no constitutional one now, to a man believing that the wife to whom he is married in this life will be his wife in the hereafter, and there can be no objection to his marrying her for both "time and eternity"; but what the constitution objects to and forbids is a man having more than one wife at any one time whether he be united, joined or married to her by a celestial marriage ceremony for "all time and eternity" or by a purely civil marriage ceremony by a justice of the peace or other civil officer, "for time only." Nor does the fact that a man belongs to a church that teaches that marriage ceremonies celebrated by its duly authorized officers and ecclesiastics remain in force and effect during both this life and all eternity disqualify him for an elector so long as it does not teach or countenance more than one of such marriages for the same person during the same period of time so as to make such marriage bigamous or polygamous.

Following closely upon the adoption of the constitution by popular vote, the supreme court of the United States, in *Davis v. Beason,* sustained and affirmed the power of a territory or state to place such restrictions and limitations on the right of franchise as contained in this constitution. Soon thereafter, and in the autumn of 1890, the president of the church, Wilford Woodruff, issued what has been popularly known as the "Manifesto," whereby the church authorities renounced the doctrine of bigamy and polygamy and declared that it should no longer be a tenet of the church or of their religious faith or doctrine and should not be taught or practiced by it or any of its members or adherents. This declaration by the church authorities was accepted by the United

States government, and President Harrison accordingly, on January 4, 1893, issued a proclamation extending general amnesty and pardon to all those who were liable to punishment under the law prior to November 1, 1890, and who had subsequently obeyed the law.    (Vol. IX, Messages and Papers of the Presidents, p. 368.)

The state of Idaho also accepted their declaration, and from 1894 to the present time, so far as we are informed, the members and adherents of the Mormon Church have quite generally exercised the right of franchise as fully as any other class or body of our citizens.    In their exercise of this right all our citizens seem to have assented until within the last few years.    The inhibitions of sec. 3, art. 6 of the constitution, however, are just as positive to-day as ever against any person who may fall within its prohibitions. Whether they do or not is in every case purely a question of fact.

In the light of the foregoing inquiry and investigations, we conclude that the framers of the constitution, and the people in its adoption, in employing the words *bigamous, polygamous, plural, celestial* and *patriarchal marriages,* meant and intended to prohibit and forbid a man having more than one wife at any one time under whatever name or designation he might choose to style his marriage; and that the use of each of those words was directed against bigamous and polygamous marriages.    A celestial or patriarchal marriage, therefore, in order to come within the prohibition of the provision of the constitution must be bigamous or polygamous.    One who teaches or practices having more than one wife at any one time or belongs to an organization that teaches such a doctrine is disqualified for the duties of an elector, and consequently for holding any civil office under the laws of this state.    On the other hand, it was never intended by the constitution to in any manner interfere with the religious *beliefs* and *opinions* of anyone.    The constitution was directed against *acts, practices* and *teachings* with reference to this life, and not against beliefs and opinions in regard to the hereafter.

The judgment must be affirmed, and it is so ordered, with costs in favor of respondent.

Sullivan and Stewart, JJ., concur both in the conclusions reached and in the statements made and reasoning employed in the opinion.